**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER ROLLINS, <br><br>              Plaintiff, <br><br>      -against- <br><br> GOLDMAN SACHS & CO. LLC, GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS INTERNATIONAL, GOLDMAN SACHS SERVICES LIMITED, JAMES P. ESPOSITO, <br><br>             Defendants. | Case No.: 18-CV-7162 <br><br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

**REDNISS LLC**
Seth Redniss (SR-7988)
375 Greenwich Street
New York, New York 10013
Tel. (212) 334-9200
Fax (212) 334-9212
sredniss@redniss.com

**PRESS KORAL LLP**
Matthew J. Press (MP-4194)
641 Lexington Avenue, 13th Floor
New York, New York 10022
Tel. (212) 922-1111
Fax (347) 342-3882
mpress@presskoral.com

*Counsel for Plaintiff*

Plaintiff Christopher Rollins, by his undersigned attorneys, as and for his Complaint, makes the following allegations against Defendants Goldman Sachs Group, Inc. ("GS Group"), Goldman Sachs & Co. LLC ("GSCO"), Goldman Sachs Services Limited ("GSSL"), Goldman Sachs International ("GSI") and James P. Esposito (collectively, "Firm" or "Defendants"):

## PRELIMINARY STATEMENT

1.      This action arises from an unlawful campaign of retaliation orchestrated against Christopher Rollins—a former senior Managing Director and sixteen-year veteran of the Firm—when he blew the whistle on the Firm's concealment of anti-money laundering ("AML") compliance failures associated with a notorious European businessman (the "Financier").

2.      In August 2015, two of the Firm's senior bankers, Michael Daffey and John Storey, traveled to meet with the Financier on board his 200-foot superyacht in the Mediterranean Sea. The Financier, however, wasn't yet a client of the Firm. Upon information and belief, the purpose of the meeting was to explore ways the Firm could work with the Financier in light of his history of legal problems.

3.      By 2015, there were signs that the Financier's checkered past had given way to legitimate success and Daffey, Storey, and a former vice chairman, Michael Sherwood, who knew the Financier personally, were sympathetic to him. In addition to the yacht, the Financier had a jet, a roster of high-profile advisors and, he claimed, over $1 billion to invest.

4.      Between September 2015 and August 2016, these executives used their influence within the Firm, and knowledge of its risk management systems, to steer a series of transactions linked to the Financier past AML controls. These transactions included (1) issuing $1.2 billion in bonds structured by an obscure broker affiliated with the Financier (the "Broker"); (2) opening an official client account in New York for an offshore fund controlled by the Financier (the "Fund");

(3) opening a second account for the Fund in London to execute a single trade worth more than $400 million (the "Company A" transaction); and (4) executing a series of trades in the securities of a European company that the Financier was allowed to introduce to clients of the Firm (the "Company B" transactions).

5.      Although Rollins had met the Financier socially, he had never sought a business relationship with him. When the Financier called him regarding potential transactions, consistent with compliance protocol, Rollins promptly reported the information through the Firm's appropriate channels.

6.      In August 2016, one of the Firm's clients did not pay for a number of its Company B trades, leaving the Firm with temporary exposure of $85 million. The Firm's financial crimes compliance ("FCC") division, the oversight of which includes AML, became concerned that the settlement failures were part of an illegal scheme to execute pre-arranged trades. FCC officers leapt to a conclusion that Rollins, whom the Financier had called shortly before the first Company B trade, was involved in the scheme.

7.      That September, FCC investigators, led by Anil Karpal, GSI's head of securities compliance, interviewed Rollins. They suggested that Rollins should not have had any business-related contact at all with the Financier.

8.      Rollins explained that he wasn't aware of any compliance restrictions relating to the Financier. He always understood that compliance had thoroughly vetted the Financier and his affiliates before opening accounts in New York and London. Moreover, Sherwood, Daffey and Storey all had been in contact with the Financier and lobbied for multiple transactions with his affiliates. As Rollins would learn, however, the involvement of these senior executives in the transactions with the Financier wasn't known to the investigators and later would be whitewashed

from the Firm's records, leaving the impression that Rollins had been the source of the Firm's business with the Financier.

9.      In his interviews, Rollins stated to investigators that his contact with the Financier was completely appropriate and pursuant to specific instructions he had received from one of their own compliance officers, Steven Hadermayer, who had authorized the Financier to introduce the Company B trades. At the time, compliance had evidently not viewed the Financier's role in the trades as suspicious or attempted to prevent them.

10.     Instead of clearing Rollins in light of this new information or, at a minimum, assigning investigators who were free of conflicts, the Firm suspended Rollins' sixteen-year employment.

11.     Over the next few weeks, Rollins remained suspended without a clear explanation, and it became evident that the Firm would not shift the scope of the investigation away from him and conduct an appropriate broader inquiry involving the Firm's senior management and compliance group. Instead, fearing a firmwide AML scandal, the Firm sought to pin all blame for the relationship with the Financier upon Rollins.

12.     Rollins tried to understand why he was being falsely blamed for the Firm's dealings with the Financier, and started to gather and analyze details of the relevant transactions, identifying information which previously should have tipped off the Firm to questionable activity and triggered either additional diligence or a Suspicious Activity Report ("SAR"). Rollins knew that U.S. law and regulations of the United States Securities Exchange Commission ("SEC") and Commodities and Futures Trading Commission ("CFTC") required the Firm to establish and apply appropriate AML procedures in connection with opening and monitoring trading accounts, especially in relation to foreign or high-risk entities.

3

13.     As the weeks passed and the Firm refused to explain why he was still suspended, Rollins began to report his concern that the investigation was being used to cover up serious AML and diligence failures, instead of probing them.

14.     Rollins recalled that, shortly after the Company B trade fails, Daffey had referred to the nine-figure Company A transaction in July 2016 as a mistake and, referring to the Financier, told Rollins that the Firm couldn't handle "another scandal."

15.     When Daffey realized that Rollins was actively questioning the Firm's investigation in relation to the Financier, he tried to persuade Rollins to stop fighting the process—promising him that if he was "contrite" and assumed responsibility for the Firm's relationship with the Financier, he would be able to return to his job. Rollins refused to be scapegoated and, in late October 2016, the Firm commenced a Kafkaesque disciplinary process, pressuring Rollins to confess to violating compliance restrictions relating to the Financier—even though the Firm could never identify any actual restrictions.

16.     After Rollins persisted in challenging the Firm's conduct at a disciplinary hearing chaired by James Esposito, Esposito decided that Rollins' 16-year career with the Firm would be terminated on February 5, 2017. Esposito based the decision on the pretext that Rollins had breached alleged compliance restrictions in connection with the Financier. However, these purported restrictions never were identified at any stage of the process—or even in Esposito's written decision.

17.     On December 4, 2016, Rollins filed an internal report of potential violations of U.S. law with the Firm's US and UK legal departments, reporting the Firm's massive compliance failures and use of a sham investigation and disciplinary process in an attempt to conceal them.

18.     Rollins also formally reported this information directly to two of the Firm's U.S. regulators, submitting Form TCRs to the CFTC and SEC.

19.     GS Group and GSCO which, upon information and belief, were actively settling unrelated CFTC charges at the time, refused to investigate Rollins' allegations. Instead, they conspired with GSI in London, where Rollins had just finished a 3-year assignment from New York, to treat the entire situation as a U.K. matter, in an effort to distance the Firm's U.S. operations from the Financier.

20.     After terminating Rollins in retaliation for his unwelcome reporting efforts, the Firm further retaliated against Rollins by providing false and damaging information about Rollins to regulators, defaming Rollins to prospective employers and cancelling millions of dollars in equity awards.

21.     In contrast to its damaging statements to regulators, including publicly available comments in the U.S., and to other third-parties, the Firm has privately confirmed privately to Rollins that he did not engage in any illegal or unethical activity and characterized his termination as without Cause—conceding that there never was any legitimate reason for their actions against him. The Firm has also admitted that the compliance restrictions cited by Esposito in the decision he signed to terminate Rollins, do not exist.

22.     According to an August 5, 2018, article in the Wall Street Journal announcing Esposito's promotion to global co-head of trading, the Firm's securities division is a "minefield of risk."[1]

---

[1] Liz Hoffman, *Goldman Sachs to Name New Trading Co-Head Amid Reboot*, Wall Street Journal, Aug. 5, 2018.

23.     Rollins now brings this action to end to the Firm's campaign against him and to recover substantial damages arising from the Firm's illegal retaliation in violation of 7 U.S.C. § 26(h)(1)(A) (commodities) and 15 U.S.C. § 78u-6(h)(1)(A)(i)-(iii) (securities), as well as for fraud and defamation.

## JURISDICTION AND VENUE

24.     The Court has jurisdiction over Plaintiff's claims under the Dodd–Frank Reform Act, 7 U.S.C. § 26(h)(1)(A) and 15 U.S.C. § 78u-6(h)(1)(A)(i)-(iii) pursuant to 28 U.S.C. § 1331, because they arise under the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, because they are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants' global headquarters is located at 200 West Street, New York, New York, 10282, and because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## PARTIES

26.     Plaintiff Christopher Rollins is a citizen of the United States and resident of the United Kingdom, who, at all relevant times, was employed by GSCO. Prior to his termination, Rollins was a Managing Director and co-head of Execution Services in Europe, the Middle East and Africa ("EMEA") with responsibility for cash equities trading, cash equities sales trading, cash sales portfolio trading, electronic trading, listed derivatives, futures, global institutional cross-asset sales and trading, a position which included the supervision of salespeople registered with the CFTC. Rollins currently works in London as CEO of a financial services firm.

27.     Defendant GS Group is a bank holding company and the publicly held parent company of various subsidiaries and affiliates, including defendants GSCO, GSSL and GSI, with its principal place of business is in New York City. GS Group oversees the risk management procedures for entities within the Firm, including responsibility for preparing and filing SARs.

28.     Defendant GSCO is a limited liability company owned and controlled by GS Group, with its principal place of business in New York City. GSCO is a banking, securities and investment firm and the Firm's principal U.S. broker-dealer. GSCO. As a broker-dealer, futures commission merchant and adherent to International Swaps and Derivatives Association ("ISDA") protocol, GSCO is required to comply with CFTC and SEC rules and regulations.

29.     Defendant GSSL, is a British Virgin Islands company with its principal place of business in Tortola. Upon information and belief, GSSL provides administrative services to entities within the Firm and, at all relevant times herein, was an agent of GSCO, providing payroll services on GSCO's behalf while Rollins was on assignment in the U.K.

30.     Defendant GSI is a British company, owned and controlled by GS Group, with its principal place of business in London, United Kingdom. GSI is regulated by the Financial Conduct Authority ("FCA") and Prudential Regulation Authority ("PRA"). Since October 2016, GSI has been required to report suspected and known breaches of the PRA's Individual Conduct Rules (the "Conduct Rules").

31.     Defendant James P. Esposito ("Esposito") is a United States citizen employed by GSCO based in the United Kingdom. On August 5, 2018, the Firm announced that Esposito, a member of the Firm's Management Committee, had been appointed global co-head of the securities division.

**ROLLINS' EMPLOYMENT WITH THE FIRM**

32.     After graduating from Harvard University with honors in June 2000, Rollins joined GSCO as a sales trader in New York. Ten years later, as one of the top three producers in the U.S. securities business, the largest commission-based business unit within the global equities franchise, Rollins was promoted to Managing Director.[2] In 2013, GSCO sent Rollins on a three-year assignment to London where, in 2015, he was selected for the Managing Director Leadership Acceleration Initiative ("MDLAI"), an elite program reserved for the Firm's highest performing Managing Directors.

33.     In June 2016, Rollins was promoted again, to co-head of Execution Services for EMEA, in which role he supervised more than one hundred employees globally, including salespeople trading SEC and CFTC-regulated products. By 2016, Rollins had dedicated his entire sixteen-year professional career to the Firm and was one of the largest regional producers and among the highest ranked Managing Directors, globally, in annual performance reviews. Rollins' career was unblemished by any ethics or performance-related issues.

### TOP EXECUTIVES ENGINEER CLOSE TO $2 BILLION IN TRANSACTIONS WITH THE FINANCIER

34.     With more than $900 billion in assets, the Firm is required to maintain an adequate governance and compliance risk management framework and ensure that each business unit implements appropriate policies and procedures—including those relating to conducting enhanced due diligence on high risk customers, monitoring customer accounts, and implementing and enforcing compliance restrictions to detect and investigate signs of potential suspicious activity.

---

[2] Rollins and GS Group entered into a Managing Director Agreement dated as of January 1, 2011 (the "MDA") governed exclusively by New York law. During his U.K. assignment from 2013 through 2016, Rollins' was assigned to GSSL but remained a GSCO employee.

35.     In September 2015, a month after Daffey and Storey met with the Financier on his yacht, the Firm agreed to issue $700 million in bonds with the Financier's Broker, earning the Firm millions in fees. Upon information and belief, Sherwood was aware of the Financier's interest in the Broker and, as GSI's then-CEO, approved the deal.

36.     In parallel with the bond offering, Daffey kicked off the account opening process for the Financier's Fund in New York and London, hoping to gain access to the $1 billion the Financier claimed to have raised. Among other things, the accounts would be used to invest the Financier's funds in stocks, futures, swaps and derivatives.

37.     In October 2015, GSCO's client implementation team in New York began conducting its diligence on the Fund. That month, Daffey and the Financier met in London at a small party at which the Financier gave Daffey's wife an expensive set of jewelry as a gift. In late October, GSCO completed its diligence. Upon information and belief, GSCO did not apply enhanced due diligence in connection with onboarding the Fund and did not question any of the information contained in the Fund's diligence materials, including information regarding the amount and origin of funds.

38.     On December 1, 2015, the Fund provided GSCO with settlement instructions and notice that the Firm would start trading in two weeks. A week later, on December 8, 2015, GSCO emailed confirmation that the Fund's account at GSCO was "active and ready to trade."

39.     Compliance at GSI, however, citing the Financier's past legal problems, pushed back on Daffey's efforts to open a second account in London. Nevertheless, Daffey continued, undeterred, throughout 2016.

40.     In June 2016, GSI issued an additional $500 million in bonds with the Financier's Broker. Then, in mid-July 2016, although he was in direct contact with Daffey and Storey, the

Financier called Rollins, asking whether the Firm would be interested in selling a large stake in Company A that the Fund had acquired a few weeks earlier. The Financier offered the transaction on the condition that it be executed immediately. Rollins then passed all of this information on to Daffey and Storey.

41.     The Firm's response was quick and enthusiastic. The trade would generate millions in fees and give a needed boost to the Firm's investment banking division's rankings in the regional League Tables.

42.     On July 18, 2016, the Firm began the account opening process in London, conducting diligence on an expedited basis to meet the strict deadline the Financier had imposed.

43.     At first, for reasons unknown to Rollins, the Firmwide Commitment Committee would not approve the trade. Daffey and Sherwood had then met with Richard Gnodde, another vice chairman and Management Committee member, and the Firm greenlit the trade. Rollins was not involved in any decisions relating to the Firm's initial rejection, or its subsequent approval, of the transaction.

44.     Later that day, the Firm opened an account for the Fund. After just a few hours, the Firm successfully placed the Fund's entire stake with some of its largest clients, a majority in the U.S. The trade returned aggregate proceeds of more than $400 million to the Financier's Fund and, for less than two days' work, the Firm earned approximately $7 million. Daffey and Sherwood were ecstatic and Sherwood personally called Rollins to thank him for his role in apparently bringing the trade into the Firm.

45.     A week later, on July 27, 2016, Daffey and Storey met with the Financier at his office. They celebrated the successful trade with expensive wine and discussed additional transactions they could do with companies in the Financier's portfolio. The Financier proposed a

number of possibilities—including involving Company B, which was displayed on his Bloomberg terminal and was discussed by he and Daffey at length.

46.     The following week, on August 3, 2016, the Financier called Rollins stating that a number of the Firm's current clients were interested in buying and selling Company B securities, and offering to make those introductions.

47.     Unlike in the Company A trade, the Financier made clear that he was simply making introductions and would not be a buyer or a seller. Although Rollins was unaware of the Financier's discussions with Daffy and Story concerning Company B the week before—and believed that all AML concerns about the Financier had been satisfied—Rollins knew that third-party introductions had the potential to be improperly pre-arranged trades.Thus, Rollins would not agree to proceed with the trades unless he could obtain compliance approval.

48.     Shortly after speaking with the Financier, Rollins met with Hadermayer, of the firm's compliance department, and fully disclosed the details of the Financier's call. Hadermayer instructed Rollins to allow the Financier to make the introductions.

49.     After receiving approval, between August 3 and 18, Rollins and other registered Firm salespeople together negotiated a total of eight trades introduced by the Financier in the securities of Company B. In each case, Rollins acted on behalf of a counterparty that was a long-standing GSI client, fully authorized for execution business. After executing the last trade on August 18, 2016, Rollins left for his mandatory vacation.

50.     While out of the office, Rollins was notified that one of the Firm's clients (the "Purchaser") had failed to pay for a number of its Company B trades and owed the Firm approximately $85 million.

51.     The settlement failures were promptly escalated. While still on vacation, Rollins spoke to members of the Purchaser's coverage team, including multiple Managing Directors and the Firm partner responsible for the entire region in which the Purchaser was located. They stated that they had held several in-person meetings with the Purchaser, and that the delay in payment was simply an administrative matter.

### THE FIRM SUSPECTS THE FINANCIER OF MANIPULATING TRADES

52.     Notwithstanding the Purchaser's assurances that full payment would be made, the default continued into September 2016, putting the Firm in the unexpected position of holding nearly a 10% stake in Company B equity and convertible bonds, the prices of which were falling. Upon information and belief, the Firm came to believe that the settlement failures were part of a series of side-deals the Financier had made (and allegedly breached) with various third-parties regarding Company B securities.

53.     Contemporaneous media reports and lawsuits indicated that, contrary to representations made to the Firm concerning the Fund's assets during onboarding in New York and London, the Financier was deeply in debt. Overnight, the Financier's status with the Firm—recently celebrated by Sherwood, Daffey and Storey—reverted to that of a toxic regulatory risk.

### ROLLINS REPORTS THAT COMPLIANCE
### APPROVED THE TRADES, AND IS SUSPENDED

54.     Rollins' three-year U.K. assignment in London came to an end on August 31, 2016, coinciding with the settlement failures. Rollins, however, remained in London waiting for a new employment agreement for a permanent position with GSI in London.

55.     On Thursday, September 22, 2016, Rollins received an overnight package from GSI marked "UK Contract." Inside were sixteen pages of employment related documents. Rollins had no idea that he was under investigation or that his future with the Firm was conditioned on the

outcome of the investigation. Thus, he attached no significance to a three-page document that purported to link Rollins' employment to GSI's disciplinary policy and the PRA's Conduct Rules.

56.    Rollins signed the UK Contract and reported to work at GSI's London offices on Monday, September 26, 2016, for his first week under the new agreement.

57.    Shortly after he arrived, however, Rollins was swept into a conference room and interviewed for the first time in an investigation of the failed trades. The well-versed team and binders of documents indicated that investigation had been underway for some time. Four days later, on September 30, he was interviewed for a second time while on business in Boston. In the course of these interviews, Rollins reported that the compliance department had specifically approved the Company B trades. Rollins' detailed disclosures about the true extent of the Firm's dealings with the Financier, the deep involvement of Daffey and Storey, and compliance's role in approving the transactions, didn't seem to result in any changes in the investigators' treatment of him. At the conclusion of the second interview, an HR representative on the call advised Rollins that his employment was suspended, effective immediately. It was the first week of what Rollins thought was a new job.

### THE FIRM OFFERS TO LIFT HIS SUSPENSION, IF ROLLINS HELPS COVER UP THE TRUE EXTENT OF THE FIRM'S RELATIONSHIP THE FINANCIER

58.    Rollins not only was troubled by the suspension, but also because the Firm refused to confirm the compliance department's approval of the Company B trades. Rollins engaged a lawyer to try to find out why he still was being investigated and to make sure that the Firm secured evidence of his August 3, 2016 meeting with compliance.

59.    One of the Firm's lawyers in London, David Lipworth questioned the need to preserve this evidence, writing on October 5, 2016:

> [M]y understanding is that it is common ground that [Rollins and Hadermayer] spoke in person in early August but that it is not clear to what extent this related to the specific trades in contemplation. So that we can consider evidence preservation, does Chris recall whether the conversation was in person or over the phone?

60. A few days later, on October 7, 2016, Lipworth explained that the investigation:

> primarily relates to Chris's dealings with [the Financier] and whether the nature of that interaction was contrary to Compliance restrictions imposed on the firm conducting broking business with [the Financier's Fund]. As I explained to you if the review proceeds to a more formal process, the concerns about Chris's conduct and the relevant policies and business principles will be set out in writing.

61. When Rollins' attorney explained that Rollins was not aware of these restrictions and asked for a copy, Lipworth ignored the request. Four days later, however, Lipworth claimed that it was unnecessary to send Rollins a copy of the restrictions, because, according to Lipworth, Rollins already knew what they were.

62. In his October 11, 2016 email, Lipworth wrote:

> [M]y understanding is that Chris acknowledges that following enhanced due diligence the Financial Crime Compliance team had imposed restrictions on engaging with the Financier/the Financier. He attended a call with senior Compliance management on or around 3 May 2016 at which their reasons for imposing these restrictions was explained in detail.
>
> The internal review relates to concerns that these restrictions were not followed. These enhanced due diligence procedures are outlined in the GS U.K. Anti-Money Laundering Manual – a copy of which I will forward to you. My understanding is that Chris understood and has not questioned the clarity of the Compliance dialogue but please let me know if you are implying otherwise.

63. Rollins' lawyer explained, once again, that Rollins was not aware of any applicable compliance restrictions or a May 3, 2016 telephone call, and again asked for the Firm to supply Rollins with a copy of the restrictions. Lipworth refused.

64.     For weeks, a score of Firm representatives dodged Rollins' repeated requests for disclosure of the restrictions that he allegedly violated. In a series of circular emails, Rollins repeated, directly and through counsel, that he was not aware of any restrictions and asked to see them. In response to each request, Lipworth and a second lawyer, David Mackenzie, refused, echoing the same false refrain:

- "Chris is fully aware of the reasons for the firm's concerns" (October 19, 2016, email from David Mackenzie);

- "Chris is aware of the instructions in question and he has confirmed that he understood those instructions at all material times" (October 24, 2016, email from Mackenzie);

- "Chris acknowledges that he received and understood the instructions he had been given" (October 24, 2016, email from Mackenzie).

65.     Rollins voiced his disbelief to Daffey and Storey, who appeared sympathetic but told him that "legal" had to run its course. In separate conversations, senior executives counseled Rollins against challenging the process and assured him that, as long as he was "contrite," he could return to his desk.

66.     On October 11 and 12, 2016, Rollins was interviewed a third and fourth time. In each session, the investigators pressured Rollins to take responsibility for the Firm's problems with the Financier, without ever disclosing purported compliance restrictions or investigative findings. The Firm had not changed any of the investigators and still wouldn't confirm that Hadermayer had approved the Company B trades.

67.     Despite his growing frustration, Rollins cooperated fully with the investigation. In addition to giving four interviews, Rollins turned over two cell phones for inspection and volunteered to take a polygraph to prove that he had obtained compliance approval.

68.     By mid-October, it had been three weeks since Rollins suddenly disappeared from his desk—without any explanation given to colleagues or clients. Because the Firm locked Rollins out of his work email, without allowing him to set up an auto-response, hundreds of incoming emails had gone completely unanswered—adding to the pressure on Rollins to do whatever he could to return to his job.

69.     On or about October 19, 2016, the fourth week of his suspension, Daffey and Storey advised Rollins that the investigation now was over, but that Rollins would have to go through a disciplinary hearing. They told him that the "business" had managed to arrange for Defendant James P. Esposito to be the decision-maker, and that he would be a "friendly arbitrator." Daffey and Storey again assured Rollins that as long as he was "contrite"—in other words, as long as Rollins accepted responsibility for the Firm's relationship with the Financier—he'd get a slap on the wrist and be able to return to work right away.

70.     Two days later, on Friday, October 21, 2016, Rollins received three hundred sixty-five pages of documents (the "Record"), and a cover memo from Karpal (the "Disciplinary Memo"). The Firm had scheduled the hearing for the next Tuesday at 8:00 am, giving Rollins just a single business day to review the materials and prepare.

71.     The Record included a written investigation report (the "Report"), purported summaries of Rollins' four interviews (the "Interview Summaries"), and few hundred pages of miscellaneous documents, including records of Rollins' communications with the Financier. Conspicuously, the Record did not reflect the deep involvement of Daffey and Storey with the Financier. Nor did it contain any compliance restrictions, a transcript of the purported May 3, 2016 call, the AML policy, the Conduct Rules or any other legal standard that the Firm claimed Rollins may have breached.

72.     Despite the lack of any clear allegations of misconduct by Rollins, the documents were a calculated effort to create a false record that Rollins had developed a close relationship with the Financier and, acting alone, had bent the rules to allow him to do business through the Firm.

73.     The Record excluded any reference to Sherwood; to the July 27, 2016 meeting between Daffey, Storey and the Financier that set the Company B trades into motion; to how GSCO had been able to onboard the Financier's fund in New York; the content of anything that Sherwood, Daffey and Storey had discussed with the Financier, including the meeting on the Financier's yacht in August 2015; or the $1.2 billion in bonds issued with the Financier's Broker.

74.     That night, Rollins and Daffey met. Rollins stated angrily that the documents were deliberately false—and obviously meant to serve as a regulatory insurance policy for the Firm. Daffey didn't appear surprised. When Rollins asked Daffey if he was going to lose his job, Daffey said the Firm liked a "redemption story" and repeated that if Rollins didn't fight the charges, and was "contrite," he'd receive no more than a slap on the wrist—which Daffey specified would mean a one-year mark on his compliance record and a 10% percent reduction in his annual compensation for 2016. Rollins protested that he wasn't comfortable taking the blame for any and all fall out relating from the Financier. In response, Daffey cajoled Rollins, explaining that what was going on had little to do with Rollins, but was because the blowup with the trades couldn't have come at a worse time for the Firm.

## ESPOSITO TERMINATES ROLLINS FOR VIOLATING UNKNOWN FCC RESTRICTIONS, WHILE GSI SECRETLY REPORTS A DIFFERENT VIOLATION TO THE PRA

75.     At the disciplinary hearing on October 27, 2016, Rollins met with Esposito and Leslie Reider—who Rollins believed was a junior HR representative, but actually was a GSCO lawyer.

76.     Instead of offering himself as a scapegoat for the Firm's AML failures and other problems with the Financier, Rollins presented Esposito with a four-page statement (the "October 2016 Statement") that pointed out numerous defects in the Firm's disciplinary process, including the lack of any compliance restrictions that applied to the Company B trades, or any other policy, rule, law or standard that Rollins was accused of violating. Although the Firm's lawyers had, during the investigation, referred to AML policy or the U.K. Conduct Rules, the Firm did not allege that he breached any such law or rule in the disciplinary materials, and no written laws, rules or policies had been included in the Record, leading Rollins to assume that the Firm had cleared him of any such violations.

77.     Rollins walked Esposito through the Company B trades, including how they had been approved by compliance and executed between buyers and sellers who were all large clients of the Firm, including the Purchaser that defaulted on payment—all previously vetted by AML compliance and approved for execution business.

78.     The sole purpose of the hearing was for Esposito to provide Rollins with an opportunity to respond to specific allegations against him before making a final decision as the Firm's judge. Nevertheless, when asked by a confused Rollins what the accusations against him were, Esposito was unable to do so.

79.     Four days after the hearing, on October 31, 2016, Reider emailed a response to some of the points Rollins had raised in his statement, in particular to his concern that he was being accused of participating in some kind of illegal scheme with the Financier. Reider said, unequivocally: "I wanted to make it clear that Goldman is not alleging that you colluded with [the Financier] in order to manipulate [Company B] stock, or that you otherwise acted unlawfully."

80.     Rollins also wrote to Reider on November 1, 2016, seeking confirmation that Esposito really was the sole decision-maker:

> In our meeting it did not seem that Jim was the one actually making the decision by himself, his indication was it was made in conjunction. How does this decision get made? Who is involved? What is the standard?

81.     Reider replied that "Jim [Esposito] is the disciplinary chair and the sole decision-maker both in relation to the facts and outcome." Rollins later learned that this was false.

82.     On November 8, 2016, Reider sent Rollins Esposito's decision (the "Decision") which was dated and signed the day before. In the Decision, Esposito conceded that Rollins disclosed the Financier's role in the Company B trades to compliance in his meeting with Hadermayer. Nevertheless, Esposito faulted Rollins for not informing Hadermayer—the *compliance officer*—of a set of still unidentified purported compliance restrictions. Esposito wrote:

> Significantly, although you had a discussion with a divisional Compliance officer about the contemplated trades and may have mentioned [the Financier] or [his fund], you did not specifically alert him to the fact that they were subject to FCC and senior management restrictions. In my view this entailed a level of negligence such as to warrant the termination of your employment.

83.     Parroting the same phrasing used by the Firm's lawyers, Esposito wrote that Rollins "understood," "received" and was "aware of" these restrictions—without detailing their substance or attaching copies. Esposito did not explain why, even if such restrictions actually existed, it would have been Rollins' role or responsibility to provide compliance restrictions to the senior compliance officer.

84.     Contrary to her representation that Esposito was the "sole decision-maker," on November 8, 2016, Reider secretly emailed Charles Eve, a compliance officer, and asked him to

act as the decision-maker on an issue that was never disclosed to Rollins—let alone tested in an adversarial process—whether Rollins had violated the U.K. Conduct Rules.

85.     Eve then apparently determined unilaterally that Rollins had violated the UK Conduct Rules, because, on November 15, 2016, the Firm filed a "Form L" with the Prudential Regulatory Authority ("PRA") which, among many false representations, indicated that Esposito found Rollins had violated the Conduct Rules after Rollins had notice and an opportunity to be heard on such a charge in an adversarial disciplinary process. The Form L stated that Rollins "did not obtain the approval of or guidance from Compliance or senior management" and that he had been "aware" of compliance restrictions. These statements to the PRA were false, and the Firm concealed the existence of the Form L from Rollins for two months, preventing him from challenging Eve's false "finding" that Rollins breached the Conduct Rules  through the Firm's internal appeal process.

## ROLLINS MAKES MULTIPLE INTERNAL AND EXTERNAL
## REPORTS OF POTENTIAL LEGAL VIOLATIONS

86.     On November 18, 2016, Rollins' counsel sent a 7-page letter (the "November 2016 Letter") to Gregory K. Palm, GS Group's General Counsel asking GS Group to intervene in the ongoing disciplinary proceedings, expunge Esposito's decision and investigate the Firm's efforts to cover up AML violations.

87.     on December 4, 2016, after Rollins finally was sent a copy of the Firm's escalation policy, he filed a formal internal report (the "2016 Internal Report"), a copy of which is attached hereto as Exhibit 1. The 2016 Internal Report was sent to lawyers at GS Group, GSCO and GSI.

88.     The 2016 Internal Report summarized how the Firm had turned on him after he reported the truth about the Firm's contacts with the Financier and refused to be scapegoated for a range of global legal violations, including violations of federal securities and commodities law.[3]

89.     The 2016 Internal Report also reported that the investigation Report and Decision were "based on evidence that the Firm has falsified and was created for regulators." Rollins demanded that the Firm stop retaliating against him and "appropriately investigate the full scope of the Company B trades and [the Financier]'s interactions with the Firm, including [Company A] and [Company B]."

90.     In January 2017, Rollins learned, for the first time, about the Form L that had been filed two months earlier. In February 2017, on one of his last days as a Firm employee, Rollins submitted a furtherreport under the Firm's Escalation Policy (the "2017 Internal Report"), a copy of which is attached hereto as Exhibit 2, sending copies to Palm, Sokotch and Lipworth.

91.     The 2017 Internal Report explicitly reported that the Firm was retaliating against Rollins for refusing to play the scapegoat and to participate in the cover up the Firm's compliance failures. Rollins wrote:

> Looking back at July 2016 now, after Goldman has spent the last six months to try to rewrite the history of its contacts with [the Financier] and shift this liability onto me, it is hard to believe that Goldman approved the U.S. $500 million transaction last July.
>
> Since I filed the December report, I believe that Goldman has retaliated against me by not retracting either the Form L or Jim's decision, filing other false notifications, concealing the Conduct

---

[3] At this time, GSCO and GSCO Group, were in the process of settling charges against them brought by the CFTC for manipulating the ISDAFIX rate, an interest rate swaps benchmark. On December 21, 2016, the CFTC ordered GSCO and GS Group to pay a $120 million penalty and take remedial steps, including the adoption and maintenance of adequate systems for detecting and deterring manipulation. In 2012, Goldman Sachs Execution and Clearing, LP, another subsidiary of GS Group, was also penalized by the CFTC for failing to diligently supervise accounts in violation of CFTC Regulation 166.3 and ordered to implement enhanced supervision policies and procedures.

Rules, not paying me a bonus or granting stock and not acknowledging my request under the Data Protection Act which includes a request for the transcript of a May 3, 2016 phone call that David Lipworth referred to by email. Also, as strongly suggested by the extreme time pressure I've been put under and manner in which I have been mistreated, it would appear that there exists a continual obstruction of an independent investigation due to fears of internal failures to manage money laundering risks and to make timely suspicious activity reports. I am very concerned by Goldman's failure to retract Jim's decision and that Goldman will continue to use its significant resources to try to hurt me and my reputation, including but not limited to by making false statements to FINRA.

92.     Upon information and belief, the Firm did not investigate or taken any other remedial action in response to either the 2016 or 2017 Internal Reports. Instead, the Firm continued its campaign of retaliation against Rollins as the messenger of such unwelcome, and highly material, information.

## THE FIRM'S ONGOING RETALIATION

93.     On March 7, 2017, GSCO filed a Form U5 with FINRA containing publicly available language implying that Rollins had been involved with the Financier in an illegal scheme to defraud. This was precisely the opposite of what Reider had specifically represented to Rollins, *i.e.* that there were no such findings and the Firm did not believe he had done anything illegal. It also contradicted the Firm's repeated statements that it had terminated Rollins without Cause.

94.     The Form U5 was intended to be, and ordinarily would be, a death sentence to the career of a financial professional. Between May and August, Rollins interviewed for comparable positions at other investment banks including, but not limited to, Deutsche Bank, JP Morgan, Barclays, Bank of America. Each company requested that Rollins explain the circumstances of his termination in light of the disclosure information contained in the Form U5 and provide a copy of Esposito's termination decision. Although there was significant interest in Rollins, each potential employer ultimately declined, citing Esposito's decision and GSCO's Form U5.

95.     Although the Firm specifically advised Rollins that his termination was without cause, in letters dated December 28, 2017 and March 14, 2018, Goldman gave Rollins notice that it had determined to cancel substantial vested equity awards belonging to him. In addition to other compensation, including his 2016 bonus, to which he was entitled, the Firm cancelled and refused to pay approximately $2,500,000.

96.     On May 15, 2018, in response to a reference request for a regulated role with BTIG U.K. Limited in London, The Firm knowingly caused GSSL to send a false and defamatory employment reference (the "Reference"), intending to bar Rollins from being hired for a senior role in the U.K.

97.     The Reference, which repeated the objectively false statements in the Form L and U5, stated:

> Christopher Rollins's final position with us was as a Managing Director within our Securities Division and that he was employed by Goldman Sachs Services Limited from 10 July 2000 to 5 February 2017.
>
> In November 2016, following a disciplinary meeting, Chris Rollins's employment was terminated for failing to act with due skill, care and diligence. The firm had restricted business with a particular counterparty by not permitting it to open an account for execution due to compliance concerns, which were conveyed to Chris. He however permitted the principal of that counterparty to introduce and arrange trades a short time later in August 2016, without the approval of or guidance from Compliance or senior management knowledgeable about the relevant concerns.

98.     Notwithstanding the Firm's ongoing efforts to prevent him from working in the industry, Rollins has managed to obtain employment and continues to invest his time and resources to contest the Firm's false statements and rebuild the career, compensation and opportunities that were unlawfully denied him as a result of Defendants' campaign of retaliation.

### FIRST CAUSE OF ACTION – ALL DEFENDANTS

**(Dodd-Frank Act's CFTC Anti-Retaliation Provisions Under 7 U.S.C. § 26(h)(1)(B)(i))**

99.     Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein.

100.     In a series of disclosures, including, but not limited those made in his interviews, the October 2016 Statement, the November 2016 Letter, December 2016 Internal Report, February 2017 Internal Report and Form TCR, Plaintiff reported his reasonable belief that the Firm was violating CFTC regulations relating to, among other requirements, opening accounts, applying enhanced due diligence on foreign customers and diligently supervising, under Regulation 166.3, all activities "relating to [GSCO's] business as a Commission registrant."

101.     Rollins provided information that supported a reasonable conclusion that GSCO could not have opened or supervised the Fund's U.S. account intended to trade CFTC-regulated products on December 8, 2015, without failing to detect or investigate red flags, including media reports that a senior advisor to the Fund was a fugitive wanted on suspicions of money laundering, information that should have sparked concerns about the source, extent and use of the Fund's capital, and the reasons why AML compliance in New York deferred to Daffey despite and opened the account despite concerns about the Financier.[4]

102.     Rollins reported other examples of how senior managers had been able to circumvent FCC controls for high-risk customers, like the Financier, when there was a significant short-term economic benefit in doing so. When red flags became impossible for the Firm to ignore after the Company B settlement failures, instead of conducting a thorough investigation in the U.S. and making a good faith determination whether SARs needed to be filed, the Firm used its investigatory and disciplinary process to generate a false record that hid many of the red flags that

---

[4] Upon information and belief, GSCO did close the account at some point in 2016, but only because it was never funded—yet another sign that the Fund may have misrepresented its finances and did not actually have $1 billion under management.

the Firm had detected, including the involvement of the top bankers who had coordinated with the Financier. Rollins provided evidence demonstrating that the information in the Firm's investigation and disciplinary documents was false, the key roles that Esposito had played to lend a façade of legitimacy by signing his name to the Decision which referred to compliance restrictions and other findings of fact which appeared authentic on the surface, but, in reality, had never been determined and may have been fabricated entirely.

103.    Rollins also noted that if the FCC had sought to impose restrictions on Firm personnel from engaging with the Financier, they never were communicated to Rollins and could not be enforced against him. However, if such restrictions existed, Sherwood, Daffey, Storey and a variety of FCC officers in the U.S. and U.K. obviously had violated them.

104.    In response to Rollins' disclosures, Defendants retaliated against Rollins for his reporting and to impede additional reporting.

105.    7 U.S.C. § 26(h)(1)(A) states in relevant part:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower (i) in providing information to the [CFTC] in accordance with subsection (b); or (ii) in assisting in any investigation or judicial or administrative action of the [CFTC] based upon or related to such information.

106.    At all relevant times, Rollins was a whistleblower within the definition of 7 U.S.C. § 26(a)(7).

107.    GSCO, GS Group and Esposito, in coordination with GSI and GSSL, retaliated against Rollins in response to his protected activities, and as such, have violated the Dodd-Frank Act.

108.    The Firm's Escalation Policy also prohibits retaliation, stating that the "Firm strictly prohibits retaliation against an employee who reports in good faith a possible violation of the matters described in this policy, no matter who the report involves."

109.    There was no legitimate, non-pretextual basis for terminating Rollins or reporting him to regulators without lawful findings supporting the Firm's statements. On January 6, 2017, after one of the Firm's lawyers admitted that Esposito could not have been referring to any specific compliance restrictions in the Decision, despite the language he used, Rollins' counsel demanded, though the Firm's lawyers, that Esposito retract his decision, noting the Firm's "willingness to expose Mr. Esposito to personal liability for signing a false statement." The Firm's lawyers responded that Esposito refused to do so.

110.    Defendants have violated 18 U.S.C. § 1513(e) which states:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

111.    Because the purported FCC restrictions never were a part of the disciplinary record, it was impossible for Esposito to find that Rollins was "aware" of such purported restrictions, or that Rollins negligently violated such purported restrictions. Because Defendants have admitted that Rollins was not terminated for "cause,", it is clear that but for Rollins' persistent reporting, his employment, and sixteen-year career with the Firm would not have been terminated—because there was no finding that would have supported termination under the Firm's own disciplinary policies.

112.    As a result of such misconduct, Plaintiff has suffered damages of no less than $50,000,000 in direct damages, as well as consequential and punitive damages in an amount to be proven at trial.

113.    In addition, Plaintiff is entitled to compensation for his litigation costs, expert witness fees, and reasonable attorneys' fees, under 7 U.S.C. § 26(h)(1)(C)(iii).

## SECOND CAUSE OF ACTION – ALL DEFENDANTS
### (Dodd-Frank Act's SEC Anti-Retaliation Provisions Under 15 U.S.C. § 78u-6(h)(1)(A))

114.    Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein.

115.    In a series of reports, including, but not limited to his four interviews, the October 2016 Statement, the November 2016 Letter, December 2016 Internal Report, February 2017 Internal Report and Form TCR, Plaintiff provided information, internally and to the SEC, based on his reasonable belief that his disclosures were required and protected under the Sarbanes-Oxley Act of 2002 as well as other laws, rules and regulation subject to the jurisdiction of the SEC relating to the Firm's AML-related compliance obligations to implement and enforce an adequate system to monitor, detect and report evidence of potential financial crimes.

116.     In addition to the red flags described above which posed risk of securities-related violations as well as commodities-related violations, this information included, but was not limited to AML/KYC violations in connection with the Company A trade in July 2016, which was approved by the Firm's Commitments Committee and the failure to file any SARs in connection with the Financier and cover-up of suspicious activity, including, upon information and belief, knowledge that the Financier had, together with a client of the Firm, attempted to execute pre-arranged through the Firm's London office in August 2016.

117.    Rollins' disclosures internally and to the SEC constitute a "protected activity" under 15 U.S.C. § 78u-6(h)(1)(A)(iii).

118.    Prior to Esposito's decision which terminated Rollins on a pretext, Defendants entered into a scheme to retaliate against Rollins for reporting legal violations.

119.    At all relevant times, Rollins was a whistleblower within the definition of 15 U.S.C. § 87u.

120.    Rollins' disclosures internally and to the SEC about the Firm's AML violations was a "protected activity" under 15 U.S. §784-6(h)(i)(A)(iii)

121.    Defendants have retaliated against Rollins due to his protected activities in violation of 15 U.S.C. § 78u-6(h)(1)(A) which states in relevant part that an employer may not "discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment."

122.    Defendants have violated 18 U.S.C. § 1513(e) which states:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

123.    As a result of such misconduct, Plaintiff has suffered damages of no less than $50,000,000 in direct damages, as well as consequential and punitive damages in an amount to be proven at trial.

124.    In addition, Plaintiff is entitled to compensation for his litigation costs, expert witness fees, and reasonable attorneys' fees, under 15 U.S.C. § 78u-6(h)(1)(C)(iii).

### THIRD CAUSE OF ACTION - ALL DEFENDANTS
#### (Fraudulent Inducement)

125.    Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein.

126.    On September 21, 2016, GSCO, GS Group, GSSL and GSI prepared and sent Plaintiff the employment documentation in an overnight envelope whose exterior label described

its contents as the "UK Contract," intending to lead Plaintiff to believe that it was his permanent UK employment contract.

127.    The UK Contract was primarily intended to confer jurisdiction over Rollins for purposes of GSI's investigation, while removing traces of the links between Rollins, GS Group and GSCO.

128.    Plaintiff executed the UK Contract, in reasonable reliance upon Defendants' representation to him that it was his permanent UK employment contract, when in fact the U.K. Contract was a self-serving document drafted and provided to Plaintiff solely for the purposes of establishing a legal basis to conduct disciplinary proceedings against him under UK law.

129.    Defendants did not disclose that Rollins' future employment with the Firm was conditioned on the outcome of the Firm's investigation and that the primary purpose of the U.K. Contract was to make Rollins a U.K. employee for purposes of retroactive application of U.K. policy and rules.

130.    Almost immediately after he signed the U.K. Contract, the Firm used it as a pretext for suspending him. When Rollins subsequently refused to participate in the cover-up and reported the Firm's misconduct, the Firm used the U.K. Contract to allow GSI to terminate Rollins under policy for U.K. employees and conceal from him the fact that he had been secretly reported to the PRA as a GSI employee found to have violated the Conduct Rules.

131.    As a result of Defendants' deception, Rollins is entitled to rescission of the U.K. Contract, a declaration that the disciplinary proceedings and resulting Decision are void.

132.    In addition, Plaintiff is entitled to damages of no less than $50,000,000 in direct damages, as well as consequential and punitive damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION – GSCO AND GSSL
### (Defamation)

29

133.    Plaintiff repeats and re-alleges all preceding paragraphs as if fully set forth herein.

134.    On or about May 15, 2018, GSSL sent a written employment reference (the "Reference") to HireRight Limited, an employment reference agency engaged by Rollins then prospective, and now current, employer.

135.    The Reference stated:

> Christopher Rollins's final position with us was as a Managing Director within our Securities Division and that he was employed by Goldman Sachs Services Limited from 10 July 2000 to 5 February 2017.

> In November 2016, following a disciplinary meeting, Chris Rollins's employment was terminated for failing to act with due skill, care and diligence. The firm had restricted business with a particular counterparty by not permitting it to open an account for execution due to compliance concerns, which were conveyed to Chris. He however permitted the principal of that counterparty to introduce and arrange trades a short time later in August 2016, without the approval of or guidance from Compliance or senior management knowledgeable about the relevant concerns.

136.    GSCO's statements were false or made with reckless disregard for the truth.

137.    GSCO's statements were defamatory *per se*, as GSCO's statements were intended to injure Rollins in his profession.

138.    GSCO had actual knowledge that Esposito had not found that Rollins violated the Conduct Rules or any investment-related statutes, regulations, rules or industry standards of conduct.

139.    Moreover, just weeks before sending the reference the Firm confirmed in writing that it did not believe, and never alleged, that Rollins had engaged in any conduct constituting "cause," that Rollins was not terminated for cause, and that the Firm never "suggested that this was the case and neither its disciplinary process nor the termination of Mr. Rollins' employment was conducted on that basis."

140.    Defendants' publication of knowingly false and defamatory statements was made with actual malice.

141.    As a result of such misconduct, Plaintiff has suffered direct damages, as well as consequential and punitive damages, in an amount to be proven at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests the following relief:

A.    An order expunging Esposito's termination Decision, the Disciplinary Memo, the Interview Notes, the Report and other records relating thereto;

B.    An order preventing Defendants from engaging in additional retaliatory conduct, including providing misleading and/or disparaging information about Rollins to third-parties, including prospective employers,

C.    Compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus prejudgment interest;

D.    An award of punitive damages;

E.    An award of costs and expenses, as well as reasonable attorneys' fees under 7 U.S.C. § 26(h)(1)(C)(iii)15 U.S.C. and/or 15 U.S.C. § 78u-6(h)(1)(C)(iii); and

F.    Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated

herein.

Dated:      New York, New York
            August 8, 2018

REDNISS LLC


By: _____
        Seth Redniss (SR-7988)


375 Greenwich Street
New York, NY 10013
Tel. (212) 334-9200
Fax (212) 334-9212
sredniss@redniss.com


PRESS KORAL LLP


By: _____
        Matthew J. Press (MP-4194)


641 Lexington Avenue, 13th Floor
New York, NY 10022
Tel. (212) 922-1111
Fax (347) 342-3882
mpress@presskoral.com

*Attorneys for Plaintiff Christopher Rollins*