Goldman Sachs International
Peterborough Court | 133 Fleet Street | London EC4A 2BB
Tel: +44 (0)20 7774 1000

Goldman
Sachs

6 September 2016

Christopher C. Rollins
c/o Peterborough Court
133 Fleet Street
London
EC4A 2BB

Dear Chris

Further to recent communications, I am writing to confirm that effective 1 September 2016, you will be employed by Goldman Sachs International ("GSI").

I attach a copy of your GSI annex which, together with your previously signed Managing Director Agreement, the Addendum thereto, this letter and the localization memo dated 6 September 2016, represent the entire understanding of the parties with respect to the matters set forth therein and will supersede any other agreement, written or oral, pertaining to such matters (save in relation to your entitlement to certain fixed remuneration in addition to your 2016 base salary, the terms and conditions relating to which have been, or will be, communicated to you separately). The Firm reserves the right to amend the Employment Documentation (as defined in the Managing Director Agreement) if necessary to comply with applicable law.

Please sign below to confirm your acceptance to the terms and conditions contained in the enclosed documentation. A duplicate copy should be returned to Liz Chick in Legal. You should retain an original copy for your records.

For and on behalf of
Goldman Sachs International

Accepted and agreed to

this 22 day of September 2016

By: _____
Christopher C. Rollins
Managing Director

The Goldman Sachs Group, Inc. | 200 West Street | New York, New York 10282-2198
Tel: 212-902-0593 | Fax: 212-902-0633 | e-mail: lloyd.blankfein@gs.com

Lloyd C. Blankfein
Chairman
Chief Executive Officer

Goldman
Sachs

As of January 1, 2011

**Personal and Confidential**
Christopher C. Rollins
Goldman, Sachs & Co.
200 West Street
New York, NY 10282

Dear Chris:

This Managing Director Agreement sets forth certain terms and conditions of your employment as a Managing Director of The Goldman Sachs Group, Inc. ("*GS*") or one or more of its subsidiaries and affiliates (GS and its subsidiaries and affiliates, and its and their predecessors and successors, are hereinafter referred to as the "*Firm*"). Certain capitalized terms are defined in Section 10 below.

### 1. Employment as a Managing Director

1.1 There will be no set term of employment, and your employment will be at will, subject to the terms and conditions of the Employment Documentation. You or the Firm may terminate your employment at any time for any reason or for no reason by giving not less than 90 days prior written notice of termination (the date of such notice being the "Notice Date" and the date that your employment terminates being the "Date of Termination"). The Firm may unilaterally shorten your notice period if you voluntarily resign your employment, with pay in lieu only for any applicable statutory minimum, and may pay in lieu of any notice period applicable to you in the event the Firm terminates your employment. The Firm may elect to place you on paid leave for all or any part of your notice period, and need not give you any advance notice in connection with a termination for Cause or Extended Absence.

1.2 During the Employment Period: (i) you will have such duties and responsibilities as the Firm may from time to time determine; (ii) you will devote your entire working time, labor, skill and energies to the business and affairs of the Firm; (iii) you will be paid the compensation specified in the Employment Documentation; and (iv) you will be entitled to participate in such benefit plans and programs as the Firm may determine in its sole discretion, under the terms and conditions thereof.

2. **Compensation**

   2.1 Your annual base salary will be communicated to you separately. Provided you are an active employee through the respective fiscal year-end, you may be eligible to receive a discretionary bonus. You will not be eligible for any such bonus if you leave the Firm for any reason or cease active employment before the respective fiscal year-end, or if you have given or received notice of termination before fiscal year-end. All monies paid will be subject to applicable deductions. The Firm may in its absolute discretion deliver all or part of any bonus awarded in the form of a non-cash award. The Firm will determine the value of any such non-cash award, the nature of the equity interest and other applicable conditions including vesting conditions, and its decision in this regard will be final. At the Firm's discretion, your base salary and any other compensation may be quoted and paid to you in another currency.

3. **Confidentiality**

   3.1 In the course of your involvement in the activities of the Firm or otherwise, you have obtained or may obtain confidential or proprietary information concerning the Firm's businesses, strategies, results, operations, financial affairs, organizational and personnel matters (including "Employment Related Matters"), policies, and procedures, and other non-public matters concerning the Firm or concerning third parties, including but not limited to clients of the Firm. Such information ("Confidential Information") may have been or may be provided in written or electronic form or orally. In consideration of, and as a condition to, continued access to Confidential Information, and without prejudice to or limitation on any other confidentiality obligations imposed by agreement or by law, you hereby undertake to use and protect Confidential Information in accordance with any restrictions placed on its use or disclosure. Without limiting the foregoing, except as authorized by the Firm or as required by law, you may not disclose or allow disclosure of (a) any Confidential Information, or of any information derived therefrom, in whatever form, to any person unless such person is a director, officer, employee, attorney or agent of the Firm and, in your reasonable good faith judgment, has a need to know the Confidential Information or information derived therefrom in furtherance of the business of the Firm or (b) any information (whether or not Confidential Information) concerning the Firm (including, without limitation, with respect to its businesses, strategies, results, operations, financial affairs, organizational and personnel matters, policies and procedures), its present or former partners, directors, officers, employees, agents or clients to any reporter, author, producer or similar person or entity or take any other action likely to result in such information being made available to the general public in any form, including books, articles or writings of any other kind, film, videotape, audio tape or any other medium. You are similarly prohibited from accessing confidential information that the Firm has not authorized you to access. You further agree that you will not use, or take any action likely to result in the use of, any of the Firm's names or any abbreviation thereof in connection with any publication to the general public in any medium.

   3.2 Outside of your employment relationship with the Firm, you also may be, or may previously have been, privy to information that is confidential or proprietary to a third party such as a prior employer. You agree that you will not use information in any manner that would constitute a violation of any obligation to or agreement with such third party.

   3.3 The existence of, and any information concerning, any dispute between you and the Firm shall constitute Confidential Information except that you may disclose such information to the arbitrator or court that is considering such dispute and to your legal counsel, provided that

(i) you notify each proposed recipient of the confidentiality of the information, and (ii) with

respect to your legal counsel, he or she agrees not to disclose the information other than as necessary to the prosecution or defense of the dispute. Nothing herein shall limit any right or obligation under applicable law to provide truthful information to judicial, regulatory, administrative, or governmental authorities.

3.4 You will not make any oral or written negative, derogatory or disparaging statement (whether or not such statement legally constitutes libel or slander), about the Firm, about any termination of your employment, or about any of the Firm's former partners or present or former managing directors, employees, officers, directors, shareholders or agents.

3.5 The obligations set forth in the preceding four paragraphs will continue to be fully binding and enforceable after the Employment Period ends, and shall cease to be binding and enforceable only if and to the extent that it is modified or terminated in writing by the Firm.

## 4. Non-Competition

4.1 In view of your importance to the Firm, you hereby agree that the Firm would likely suffer significant harm from your competing with the Firm during the Coverage Period. Accordingly, you hereby agree that you will not, without the written consent of GS, during the Coverage Period:

   (1) form, or acquire a 5% or greater equity ownership, voting or profit participation interest in, any Competitive Enterprise; or

   (2) associate (including, but not limited to, association as an officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise and in connection with such association engage in, or directly or indirectly manage or supervise personnel engaged in, any activity

   i. which is similar or substantially related to any activity in which you were engaged, in whole or in part, at the Firm,

   ii. for which you had direct or indirect managerial or supervisory responsibility at the Firm, or

   iii. which calls for the application of the same or similar specialized knowledge or skills as those utilized by you in your activities with the Firm,

   at any time during the one-year period immediately prior to termination of your employment, and, in any such case, irrespective of the purpose of the activity or whether the activity is or was in furtherance of advisory, agency, proprietary or fiduciary business of either the Firm or the Competitive Enterprise.

   (By way of example only, this provision precludes an "advisory" investment banker from joining a leveraged-buyout firm, a research analyst from becoming a proprietary trader or joining a hedge fund, or an information systems professional from joining a management or other consulting firm and providing information technology consulting services or advice to any Competitive Enterprise, in each case without the written consent of GS.)

5. **Non-solicitation**

   5.1 You hereby agree that during the Coverage Period, you will not, in any manner, directly or indirectly, (1) Solicit a Client to transact business with a Competitive Enterprise or to reduce or refrain from doing any business with the Firm, or (2) interfere with or damage (or attempt to interfere with or damage) any relationship between the Firm and a Client.

   5.2 You hereby agree that during the Coverage Period, you will not, in any manner, directly or indirectly:

   (1) Solicit any Selected Firm Personnel to resign from the Firm or to apply for or accept employment, partnership, membership or similar status with a Competitive Enterprise;

   (2) hire or participate in the hiring of any Selected Firm Personnel (whether as an employee, consultant, or otherwise) by a Competitive Enterprise;

   (3) participate in the decision to offer Selected Firm Personnel admission into partnership, membership or similar status with a Competitive Enterprise; or

   (4) participate in the identification of Selected Firm Personnel for potential hiring or admission into partnership, membership or similar status with a Competitive Enterprise.

   5.3 You acknowledge that you will have violated this provision if, during the Coverage Period, any Selected Firm Personnel are Solicited, hired or are accepted into partnership, membership or similar status

   (1) by any Competitive Enterprise which you form, which bears your name, or in which you are a partner, a member, or have similar status, or in which you possess or control greater than a de minimis equity ownership, voting or profit participation; or

   (2) by any Competitive Enterprise, and you have, or are intended to have, direct or indirect managerial or supervisory responsibility for such Selected Firm Personnel.

6. **Other obligations**

   6.1 For a period of 90 days after your Notice Date you will take all actions and do all things that the Firm may reasonably request from time to time to maintain for the Firm the business, goodwill, and business relationships with any of the Firm's clients with whom you worked during the term of your employment. In addition, prior to accepting employment with any other person or entity during the Coverage Period, you will provide any prospective employer with written notice of the provisions of Sections 3 to 5 above (hereinafter sometimes referred to as "the Covenants") with a copy containing the prospective employer's name and contact information delivered simultaneously to GS.

   6.2 You also agree that you will cooperate with the Firm (and its counsel, if applicable) in connection with any inquiry, investigation, administrative proceeding or litigation relating to any matter that occurred during your employment in which you were involved or of which you have knowledge.

EMD Agreement                                                      4

6.3 You agree that, in the event of termination of your employment, you will cooperate fully with the members of the Human Capital Management Division with respect to their procedures, which include collecting identification cards, certain firm documents, and the like. You further agree that you will reconcile all outstanding travel and expense items and pay the firm for any charge or advance that is personal or otherwise not properly chargeable to the firm under its travel and expense policies.

6.4 You represent that, while an employee of the Firm, you have duly and accurately filed all required tax returns in respect of your income and agree that you will do so in the future and will certify to that effect to the Firm, on a form specified by the Firm, from time to time if requested to do so.

6.5 You understand that the provisions of the Covenants may limit your ability to earn a livelihood in a business similar to the business of the Firm.

6.6 You acknowledge that a violation on your part of any of the Covenants would cause immeasurable and irreparable damage to the Firm. Accordingly, you agree that the Firm will be entitled to injunctive relief in any court of competent jurisdiction for any actual or threatened violation of any of the Covenants in addition to any other remedies it may have. In the event that you violate any of the Covenants, the Coverage Period shall automatically be extended by the period of time that you were in violation of said Covenant(s). You also acknowledge that a violation of any of the Covenants would be detrimental to the Firm and hence would constitute "Cause" for purposes of any equity awards from the Firm that you may hold.

6.7 If any provision of the Employment Documentation is held by a court of competent jurisdiction to be invalid, illegal or unenforceable (whether in whole or in part), such provision will be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining such provisions will not be affected thereby; provided, however, that if any of the Covenants is held by a court of competent jurisdiction to be invalid, illegal or unenforceable because it exceeds the maximum time period such court determines is acceptable to permit such provision to be enforceable, such Covenant will be deemed to be modified to the minimum extent necessary to modify such time period in order to make such provision enforceable hereunder

## 7. Deductions

7.1 You agree that the Firm shall be entitled at any time during your employment or on termination to deduct, from your base salary and/or any bonus you may receive, any amounts due from you to the Firm. Such amounts may include, but are not limited to, (i) any debt or advance owed by you to the Firm, and (ii) any amount owing relating to holiday or vacation taken in excess of entitlement as of your Date of Termination, and (iii) any costs incurred by the Firm due to your conduct (including the cost of repairing damage to the Firm's property caused by you), and (iv) any amount owing in respect of employee contributions towards benefits provided to you by the Firm, and (v) any other money owed by you to the Firm.

## 8. Arbitration

8.1 Subject to Section 9 below, and to the fullest extent permitted by law, any dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters will be finally settled by arbitration in New York City before, and in accordance with the rules then obtaining of, the Financial Industry Regulatory Authority ("FINRA"). If FINRA

declines to arbitrate the matter, the matter will be arbitrated before the American Arbitration Association ("AAA") in accordance with the commercial arbitration rules of the AAA. You agree that any arbitration decision and/or award will be final and binding upon the parties and may be entered as a judgment in any appropriate court.

8.2 You understand and acknowledge that you are agreeing to arbitrate all claims described above, in accordance with the arbitration procedure set forth above. This agreement does not include an agreement to arbitrate claims on a collective or class basis. It is explicitly agreed that, to the fullest extent permitted by applicable law, no arbitrator shall have the authority to consider class or collective claims, to order consolidation or to join different claimants or grant relief other than on an individual basis to the individual claimant involved.

9. **Injunctive Relief, Choice of Forum, Submission to Jurisdiction and Choice of Law**

9.1 Notwithstanding Section 8 above and in addition to its right to submit any dispute or controversy to arbitration, the Firm may bring an action or special proceeding in any state or federal court of competent jurisdiction sitting in the City of New York, whether or not an arbitration proceeding has theretofore been or is ever initiated, for the purpose of temporarily, preliminarily, or permanently enforcing the provisions of the Covenants or to enforce an arbitration award, and you (i) expressly consent to the application of this Section 9 to any such action or proceeding, (ii) agree that proof will not be required that monetary damages for breach of the provisions of the Covenants would be difficult to calculate and that remedies at law would be inadequate, and (iii) irrevocably appoint the General Counsel of GS as your agent for service of process, who shall promptly advise you of any such service.

9.2 You and the Firm hereby irrevocably submit to the exclusive jurisdiction of any state or federal courts located in the City of New York over any suit, action or proceeding arising out of or relating to any matter concerning the parties, including Employment Related Matters (as defined herein), which is not otherwise arbitrated or resolved according to the provisions of Section 8 above. This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. The parties acknowledge that the forum designated by this Section 9 has a reasonable relation to the Managing Director Agreement and to the parties' relationship with one another.

9.3 The agreement by you and the Firm as to this forum is independent of the law that may be applied in the action, and you and the Firm agree to this forum even if the forum may under applicable law choose to apply non-forum law. You and the Firm hereby waive, to the fullest extent permitted by applicable law, any objection which you or the Firm now or hereafter have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding brought in such court. You undertake not to commence any action arising out of or relating to this Agreement, including any of the post-employment Employment Related Matters, in a forum other than a forum described in this Section or Section 8 above. You agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon the parties.

9.4 The Managing Director Agreement will be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws.

10. **Certain Definitions**

    10.1 As used herein, the following terms have the following meanings:

"*Cause*" means: (i) your conviction, whether following trial or by plea of guilty or *nolo contendere* (or similar plea), in a criminal proceeding (A) on a misdemeanor charge involving fraud, false statements or misleading omissions, wrongful taking, embezzlement, bribery, forgery, counterfeiting or extortion or (B) on a felony charge or (C) on an equivalent charge to those in clauses (A) and (B) in jurisdictions which do not use those designations; (ii) your engaging in any conduct which constitutes an employment disqualification under applicable law (including statutory disqualification as defined under the Securities Exchange Act of 1934, as amended); (iii) your willful failure to perform your duties to the Firm; (iv) your violation of any securities or commodities laws, any rules or regulations issued pursuant to such laws, or the rules and regulations of any securities or commodities exchange or association of which the Firm is a member; (v) your breach of the Employment Documentation or any other written agreement between you and the Firm; (vi) your violation of any Firm policy concerning hedging or pledging or confidential or proprietary information, or your material violation of any other Firm policy as in effect from time to time; (vii) your engaging in any act or making any statement which impairs, impugns, denigrates, disparages or negatively reflects upon the name, reputation or business interests of the Firm; or (viii) your engaging in any conduct detrimental to the Firm.

"*Client*" means any client or prospective client of the Firm to whom you provided services, or for whom you transacted business, or whose identity became known to you in connection with your relationship with or employment by the Firm.

"*Competitive Enterprise*" means a business enterprise that (i) engages in any activity, or (ii) owns or controls a significant interest in any entity that engages in any activity that, in either case, competes anywhere with any activity in which the Firm is engaged. The activities covered by the previous sentence include, without limitation, financial services such as investment banking, public or private finance, lending, financial advisory services, private investing (for anyone other than you and members of your family), merchant banking, asset or hedge fund management, insurance or reinsurance underwriting or brokerage, property management, or securities, futures, commodities, energy, derivatives or currency brokerage, sales, lending, custody, clearance, settlement or trading.

"*Coverage Period*" means the period beginning with the effective date of your appointment as a Managing Director of the Firm and ending 90 days after the date of delivery of the written notice of termination of your employment or any earlier date as agreed by you and the Firm.

"*Date of Termination*" means: (i) if your employment is terminated by the Firm for Cause or Extended Absence, the date of the Firm's delivery of written notice of termination, (ii) if your employment is terminated by the Firm other than for Cause or Extended Absence, the date that is 90 days after the Firm's delivery of written notice of termination or any earlier date as agreed by you and the Firm, or (iii) if your employment is terminated by you, the date that is 90 days after your delivery of written notice of termination or any earlier date as determined by the Firm in its sole discretion.

***"Employment Documentation"*** means the Managing Director Agreement and any Statement of Terms and Conditions of Employment provided to you.

***"Employment Period"*** means the period beginning with the effective date of your appointment as a Managing Director of the Firm and ending with your Date of Termination.

***"Employment Related Matters"*** means matters arising out of or relating to or concerning the Employment Documentation, your hire by or employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of your employment relationship in respect of the Firm.

***"Extended Absence"*** means your absence from active employment for at least 180 days in any 12-month period as a result of your incapacity due to mental or physical illness, as determined by the Firm.

***"Notice Date"*** means the date on which either you or the Firm gives notice of the termination of your employment pursuant to Section 1 of the Managing Director Agreement or, if the termination is for Cause or Extended Absence, the date on which such termination occurs.

*"Selected Firm Personnel"* means any Firm employee or consultant with whom you personally worked while employed by the Firm, any Firm employee or consultant who, in the year preceding your Date of Termination, worked in the same division in which you worked, and any Managing Director of the Firm.

***"Solicit"*** means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action.

## 11. Policies and Guidelines

11.1 Your employment will also be subject to various Firm policies and guidelines, including those contained on HR Workways™ and in the applicable Employee Handbook (in those offices where such a handbook has been issued) as amended from time to time. In the event of any conflict between the provisions of the Employment Documentation and the provisions contained on HR Workways™ or in the applicable Employee Handbook, the provisions of the Employment Documentation will prevail.

## 12. Obligations, Notices and Assignments

12.1 The obligations set forth herein will survive, and remain binding and enforceable, notwithstanding any termination of your employment and any settlement of the financial rights and obligations arising from your employment. Notices hereunder shall be delivered to the Firm at its principal executive office directed to the attention of GS's General Counsel, and to you at your last address appearing in the Firm's employment records. The Employment Documentation may not be amended or modified other than by a written agreement executed by the parties hereto or their respective successors or legal representatives.

You may not assign your rights and obligations hereunder without the prior written consent of GS, and any such assignment by you in violation of the Employment Documentation shall be void. The Employment Documentation shall inure to the benefit of and be binding upon the Firm and its successors and assigns. The captions of the Managing Director Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

                Very truly yours,

                THE GOLDMAN SACHS GROUP, INC.

                By:    Lloyd C. Blankfein

Agreed to and accepted:

Christopher C. Rollins

11/18/2010
Date

## GOLDMAN SACHS MANAGING DIRECTOR AGREEMENT
## REVISION EFFECTIVE FEBRUARY 1, 2014

To the extent that your Managing Director agreement ("MD Agreement") with the Firm (as that term is defined in your MD Agreement) does not already so provide, the following amendments are effective as of February 1, 2014:

1. The definition of "Competitive Enterprise" in your MD agreement is superseded and replaced in its entirety with the following:

    "*Competitive Enterprise*" means an existing or planned business enterprise that

    (i) engages, or may reasonably be expected to engage, in any activity that competes with any activity in which the Firm is engaged, or

    (ii) owns or controls, or may reasonably be expected to own or control, a significant interest in any entity that does or may reasonably be expected to engage in any activity that competes with any activity in which the Firm is engaged.

    The activities covered by this definition include, without limitation, financial services such as investment banking, public or private finance, lending, financial advisory services, private investing (for anyone other than you and members of your family), merchant banking, asset or hedge fund management, insurance or reinsurance underwriting or brokerage, property management, or securities, futures, commodities, energy, derivatives or currency brokerage, sales, lending, custody, clearance, settlement or trading.

2. The definition of "Selected Firm Personnel" in your MD agreement is superseded and replaced in its entirety with the following:

    "*Selected Firm Personnel*" means any individual who is or in the three months preceding the conduct prohibited by the employee non-solicitation and non-hire provisions above, was (i) a Firm employee or consultant with whom you personally worked while employed by the Firm, (ii) a Firm employee or consultant who, at any time during the year preceding your Date of Termination, worked in the same division in which you worked, or (iii) an Advisory Director, a Managing Director, or a Senior Advisor of the Firm.

Your submission of your acceptance of your 2013 year-end equity award (which also requires check-off of the link to this document) signifies that you have read, understand, and agree to these MD Agreement amendments.

**Private and Confidential**

| | |
|---|---|
| **To** | Christopher Rollins |
| **From** | Sam Lepley, GMS, Assignment Manager |
| **Date** | September 6, 2016 |
| **Subject** | Your Localization in United Kingdom |

This memo confirms the key changes, actions and information applicable from your localization date, September 1, 2016 (the "Effective Date"). Please sign this memo to confirm that you have understood and agree to the terms described below.

For the purpose of this memo, London, United Kingdom will be referred to as your "Host Location", and New York, United States will be referred to as your "Home Location".

### Scheduled Changes Effective September 1, 2016

**Employing Entity:** Your employment with Goldman, Sachs & Co. will terminate and you will be employed by Goldman Sachs International. You will be issued with a new employment agreement with Goldman Sachs International (the "Agreement").

**ICP Allowance:** Your ICP allowance will cease.

**Compensation Delivery:** Your compensation will be paid in local currency via the local payroll in the Host Location unless stated to the contrary in the Agreement.

**Discretionary Compensation:** Any discretionary compensation you may receive for the fiscal year in which you are localized will be paid as per your election where applicable.

**Vacation:** You will transfer to Host Location vacation entitlements, currently 30 days per annum.

### Actions Required by You

**Benefits:** Contact HR Direct US at 8-902-4000 to discuss your current benefits, and HR Direct EMEA at 8-7552-1222 for questions related to your local benefits.

### Additional Information

**Immigration:** Employment with the Firm is conditional on your ongoing eligibility to work in the Host Location. Although the Firm cannot guarantee any particular result, you will continue, where applicable, to receive support from the Firm's appointed immigration provider to maintain or extend appropriate work authorization in the Host Location. You must have appropriate work authorization in order to commence local employment, and you must provide documentation establishing your authorization to work within the time period specified by the local immigration law.

**Tax Preparation Assistance:** You are required to use the Firm's appointed tax service provider and the Firm will pay reasonable cost for the preparation of the following returns:
- Host Location tax returns for each year you participated in ICP and any subsequent year where there is a trailing income relating to your assignment which impacts your tax returns.
- Home Location tax returns for any year during the assignment in which you received the Firm's compensation subject to Home Location taxation, or during which a rental property managed by the Firm's selected vendor generates a Home Location tax return requirement.

1

**Data Protection:** In connection with the ICP program, personal data concerning you and / or your family members may be transferred by the firm to a variety of third parties located within, or outside of, the Home country and the Host country for use solely in connection with the provision of services related to the ICP program. This may include, by way of example only and without limitation, transfers of basic contact information, the details of your ICP assignment, and sensitive personal data relating to religious affiliation or health matters to be used in connection with providing or obtaining information and referrals concerning educational options, medical and mental health services, and opportunities for worship. Some of these third parties will be established in countries whose laws may not afford an adequate level of protection for the privacy of individuals. These service providers will, however, be bound by written confidentiality agreements. By signing this memorandum, you consent to the transfer of personal data to such third parties as described herein.

This memo will supersede any other agreement, written or oral, pertaining to the conclusion of your assignment to United Kingdom and the matters set forth herein. It cannot be modified or amended, waived or discharged, unless such modification, amendment, waiver or discharge is agreed to in writing by the Firm.

On or before September 20, 2016, please sign one copy of this letter and return a hard copy to me to confirm that you have read and agree to the terms and conditions set forth herein. You should retain the original for your records. Should you have any questions, please contact me at Sam.Lepley@gs.com or 020 7552 8082.

I have read, understand and agree to the terms and conditions as described herein. I acknowledge that the Firm may elect to modify and/or discontinue this program in whole or in part at its discretion.

_____
Signature    Christopher Rollins

_____22 SEP 2016_____
Date

## ANNEX TO THE MANAGING DIRECTOR AGREEMENT

## STATEMENT OF TERMS AND CONDITIONS OF EMPLOYMENT IN THE UNITED KINGDOM

This Statement incorporates the written particulars required by the Employment Rights Act 1996.

1. **Employee:** Christopher Rollins

2. **Date of Employment**

2.1 Your employment (and your period of continuous employment) with the Firm commenced on 10 July 2000 and you are currently employed by Goldman Sachs International ("GSI"). The terms and conditions within this Statement are effective from 1 September 2016.

3. **Place of Work**

3.1 GSI's primary office in London is at Peterborough Court, 133 Fleet Street, although you may be required to work in one of the Firm's other offices which are situated around Peterborough Court, or in such other premises in London as the Firm may require.

3.2 During your employment, you may be required to travel in the UK and around the world on business for the Firm. You may also be required to work on a temporary basis in any of the Firm's non-UK offices.

3.3 If you are a US citizen or a US green card holder, your employment may be transferred to any of the Firm's entities for withholding and payroll administration purposes. In the event of such a transfer, you may be required to sign such transfer documents or replacement Employment Documentation as the Firm may specify.

4. **Hours of Work**

4.1 Your minimum weekly hours of work are 45 per week between Monday and Friday inclusive but you will be required to work such additional hours as are necessary to meet the business demands of your job. This may mean that your average working time exceeds 48 hours per week. You may withdraw your agreement to this provision at any time by giving not less than four weeks' notice in writing to the London Human Capital Management Division ("HCM"). If you withdraw your consent, your average working hours per week may not exceed 48 hours in any 17 week reference period.

5. **Annual Holidays**

5.1 In addition to English public holidays, you will be entitled to 30 days' paid holiday in each calendar year. This will be pro-rated in your last year of service. Details of the pro-rated holiday entitlement, as well as authorised leave other than holiday, are set out in the Goldman Sachs Workplace Policies and Procedures contained in HR Workways™ as amended by the Firm from time to time in its sole discretion (the "GS Policies").

5.2  On the termination of your employment, you will be paid in respect of any accrued but untaken holiday. You may be required to take any outstanding holiday entitlement during your notice period.

## 6. Sickness

6.1  If you are absent due to sickness, you will, provided that you comply with GSI's notification procedures as set out in the GS Policies, be paid your base salary (less any state benefits that you may claim and any applicable deductions) and usual benefits for up to 28 weeks in any period of 52 consecutive weeks. GSI's sick pay will include any entitlement that you may have to Statutory Sick Pay. Further details of sickness absence and sick pay can be found in the GS Policies. Your employment will cease to be "active" for purposes of the GS Policies during any continued absence due to sickness after 28 weeks' consecutive sickness absence.

6.2  Entitlement to GSI's sick pay scheme and any contingent or accruing entitlement to long term sickness benefit is subject to GSI's right to terminate your employment in accordance with applicable notice provisions.

6.3  In connection with your absence, GSI may require you to undergo a medical examination by its nominated doctor or consultant, for which GSI will bear the cost. GSI may also elect, with your consent, to consult your personal doctor.

## 7. Additional Fixed Remuneration

7.1  In addition to your annual base salary, you may receive additional fixed remuneration. Details of such additional fixed remuneration, and any related terms and conditions, are notified separately.

## 8. Pension and Related Benefits

8.1  GSI offers a pension benefits plan (the "Plan"), details of which have been provided to you previously. If you are not already a member of the Plan, then, if eligible, you will be automatically enrolled in the Plan when the auto-enrolment legislation applies to you. If you wish, you can opt-out of this. Further information about the Plan and about how auto-enrolment applies to your employment can be found in the GS Policies. The Plan is non-contributory.

8.2  Plan members may also be eligible to receive long term sickness benefits and life assurance. Further information about these benefits can be found in the GS Policies.

## 9. Discretionary Benefits

9.1  GSI offers a choice of healthcare plans, details of which have been provided to you previously.

9.2  The Firm has a world-wide plan which provides additional travel insurance cover whilst travelling on business of five times salary up to a maximum amount. This includes travel directly to and from work.

9.3  These benefits are discretionary; they may be withdrawn or varied at any time.

### 10. Discipline and Grievance

10.1 GSI's disciplinary policy is contained in the GS Policies. Whilst the disciplinary process does not form part of your contract of employment, the disciplinary rules do. In certain circumstances and as outlined in the GS Policies, you may be suspended from your duties.

10.2 If you are dissatisfied with a disciplinary decision taken against you, you should contact one of the members of the Employee Relations Group within London HCM, who will arrange for your concern to be raised with the appropriate person.

10.3 If you have a grievance, you may raise the matter with your manager either in writing or in person or you may use GSI's grievance procedure, details of which are set out in the GS Policies.

### 11. Collective Agreements

11.1 There are no collective agreements that affect your employment with GSI.

### 12. GS Policies

12.1 You agree to comply with the rules and procedures contained in the GS Policies.

### 13. Governing Law

13.1 The terms and conditions of your UK-specific employment, as set forth in this Statement, shall be governed by and interpreted in accordance with the laws of England and Wales.

### 14. Financial Conduct Authority and Prudential Regulation Authority

14.1 GSI is authorised by the Prudential Regulation Authority ("PRA") and regulated by the Financial Conduct Authority ("FCA") and the PRA. It is a condition of your employment to comply with the rules of the FCA and the PRA as amended from time to time, together with the rules of any other organisation by which GSI may become regulated, or with whom it may be registered.

UNDERSTOOD AND AGREED:

_[signature]_

Christopher Rollins

22 SEP 2016

Date