I9DHRO1O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHRISTOPHER ROLLINS,

                    Plaintiff,

            v.                          18 Civ. 7162 (ER)

GOLDMAN SACHS & CO. LLC, et
al.,
                                        Oral Argument

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        September 13, 2018
                                        11:46 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                         APPEARANCES

REDNISS & ASSOCIATES
      Attorneys for Plaintiff
BY:  SETH E. REDNISS

LAW OFFICE OF MATTHEW J. PRESS
BY:  MATTHEW J. PRESS

SULLIVAN & CROMWELL, LLP
      Attorneys for Defendants
BY:  THEODORE O. ROGERS, JR.
      MATTHEW J. PORPORA

I9DHRO1O

1          (Case called)

2          THE COURT:  Counsel.

3          MR. REDNISS:  Good morning, your Honor.  I'm Seth

4   Redniss, for plaintiff Christopher Rollins.

5          MR. PRESS:  Matthew Press, for Christopher Rollins.

6          MR. ROGERS:  Theodore Rogers, Sullivan & Cromwell, for

7   defendants, your Honor.

8          MR. PORPORA:  Good morning, your Honor.  Matthew

9   Porpora, also for the defendants.

10          THE COURT:  This matter is on for pre-motion

11   conference.  This is the first time the parties are before me,

12   so let me begin with the plaintiffs, Mr. Press or Mr. Redniss,

13   tell me what this case is about.  You can remain seated.  Just

14   please speak directly to the microphone.

15          MR. REDNISS:  Thank you, your Honor.

16          This case is based on retaliation that Mr. Rollins

17   suffered as a result of refusing to go along with a cover-up of

18   what we believe were AML failures.

19          THE COURT:  Of what failures?

20          MR. REDNISS:  Anti-money laundering failure.

21          THE COURT:  Oh, AML.

22          MR. REDNISS:  Excuse me, your Honor.  Instead of going

23   along with the pressure he was put under to play the scapegoat

24   for decisions made by senior managers in the U.S. and UK, he

25   instead took multiple steps over time to report those efforts

I9DHROlO

1    and expose regulatory misconduct.

2              THE COURT:  OK.  Mr. Rogers or Mr. Porpora, these are

3    allegations.  You don't need to respond to them if you don't

4    want.  However, if there's any additional color you want me to

5    be aware of at this time, I'm happy to hear you.

6              MR. ROGERS:  Yes, your Honor, thank you.

7              The plaintiff here is a former executive of Goldman

8    Sachs whose employment -- he was based in London.  His

9    employment was terminated in London pursuant to UK employment

10   procedures after it was determined that he continued to do

11   business with someone who firm executives had said they didn't

12   want to do business with for the time being.  The alleged

13   complaints that he's trying to dress up as a whistleblower

14   complaint all took place in the course of, according to the

15   complaint, the investigation that the firm initiated of his

16   behavior and then also includes alleged complaints he made

17   after his employment was terminated.  He's a party to an

18   arbitration --

19             THE COURT:  Was he aware of the investigation that the

20   company was conducting?

21             MR. ROGERS:  Yes, indeed.  He was interviewed as one

22   of the first people interviewed.  And the complaint alleges

23   that in the course of his interview, he raised complaints, but

24   it was all a routine employment investigation and termination.

25             He is a party to an arbitration commitment that he

I9DHROlO

signed when he became a managing director of the firm in 2011,

and he reaffirmed that managing director agreement and the

arbitration commitment contained therein on September 22, 2016,

when he signed what the complaint describes at paragraph 126 as

his United Kingdom employment contract, which was an integrated

set of documents that are contained in Exhibit B to our

pre-motion conference letter.

Now, in response, plaintiff's counsel has referred to

one piece of that integrated document, a so-called localization

memo.  He attaches it to his letter as though it were a

standalone document, but if your Honor would look at the first

page of Exhibit B -- and I have another copy here if that's of

convenience to you.

THE COURT:  The cover letter?

MR. ROGERS:  Yes.

-- the letter says in the second paragraph:  "I attach

a copy of your GSI annex" -- GSI is defendant Goldman Sachs

Incorporated, which is the employing entity in the UK -- "which

together with your previously signed managing director

agreement" -- that's the agreement that has the arbitration

commitment -- "the addendum thereto" -- this letter -- "and the

localization memo" -- that's the one that plaintiff's lawyer

tries to cherry pick -- "represent the entire understanding of

the parties with respect to the matters set forth therein."

The final paragraph says:  "Please sign below to

I9DHROlO

1    confirm your acceptance of the terms and conditions contained

2    in the enclosed documentation."  And there can be no dispute

3    that the enclosed documentation included an arbitration

4    agreement.

5          We would like to move to stay this matter pending

6    arbitration.  There were four claims brought here, three of

7    which indisputably are arbitrable: a Dodd-Frank SEC

8    whistleblower claim, a fraudulent inducement common law claim,

9    and a defamation claim.  We've cited the law, and in our motion

10   paper we can cite more law, but it's indisputable it's

11   arbitrable.

12         There was one motion made, we believe, intentionally

13   to avoid arbitration, which is an alleged whistleblower claim

14   under the Commodity Exchange Act.  The plaintiff alleges he

15   made a complaint to the CFTC.  However, the complaint does not

16   give the date of that alleged complaint.

17         Now, the Commodity Exchange Act whistleblower

18   provision explicitly provides that there is only liability if

19   someone has an adverse action taken because of a complaint to

20   the CFTC.  There's no allegation in this complaint of the date

21   of the alleged complaint.  There's no allegation that Goldman

22   Sachs or any of the defendants ever knew that he made a

23   complaint to the CFTC.  Certainly the first time that we

24   believe we became aware of it was with the filing of this

25   complaint, but certainly not at the time of the adverse action

I9DHROlO

1    here.

2         Now, there can be some confusion because the SEC

3    portion of Dodd-Frank has a broader whistleblower claim.  It

4    provides that so long as someone has complained to the SEC, if

5    that person is retaliated against because of internal

6    complaints, there can be liability.  But the Commodity Exchange

7    Act provision does not have that second piece.  It explicitly

8    only provides that there is liability if someone is retaliated

9    against because of a CFTC complaint, and the complaint here in

10   this action does not allege that.  And I can refer your Honor

11   to the Federal Register.  The CFTC back in 2011 in a prior

12   administration made clear that there's only liability if a

13   whistleblower under the Commodity Exchange Act provision is

14   retaliated against or has adverse action because of a CFTC

15   complaint.

16        THE COURT:  Is that a claim that's made in the

17   complaint that you -- that may not be subject to the

18   arbitration agreement?

19        MR. ROGERS:  The claim that may not be subject to the

20   arbitration agreement is a claim in the complaint that he was

21   retaliated against for having complained to the CFTC.

22        THE COURT:  Right.

23        MR. ROGERS:  However, he does not allege when the

24   supposed complaint took place.  He does not allege that Goldman

25   Sachs ever knew of any such action.  And more importantly, your

I9DHRO1O

1    Honor, well, perhaps just as importantly factually, this is a

2    substantial allegation.  The allegation is that an account was

3    opened that could have traded commodities, but even in the

4    complaint it's alleged, this is paragraph 101 and note 4, that

5    it never was funded.

6        The Second Circuit has confirmed that a stay of an

7    entire case is appropriate, this is *Genesco v. Kakiuchi*:

8    "Broad stay orders are particularly appropriate if the

9    arbitrable claims predominate the lawsuit and the

10    non-arbitrable claims are of questionable merit."  And, your

11    Honor, that fits this just like a glove.

12        We would in this motion if the Court -- we would

13    alternatively move to dismiss that claim, the CFTC

14    whistleblower claim, as well as the CFTC claim both, one,

15    because there's no allegation of timing of alleged complaints

16    to the SEC or CFTC, and it's a requirement of both acts that

17    the supposed retaliation take place after those alleged

18    complaints.  Also, Dodd-Frank, the act that handles both

19    prongs, doesn't apply extraterritorially, and the allegations

20    here are that retaliation supposedly took place in England by

21    the firing of this individual who was based in England.  There

22    are also additional grounds for dismissal that we described in

23    our papers.

24        THE COURT:  Mr. Redniss.

25        MR. REDNISS:  Thank you, your Honor.  Mr. Roger

I9DHRO1O

1  covered a lot of ground so before getting to cherry-picking

2  documents and the CFTC's guidance on internal reporting

3  retaliation, I want to start where he started, which is

4  Mr. Rollins' employment status initially under the managing

5  director agreement.

6          THE COURT:  Mr. Rollins?

7          MR. REDNISS:  Employment agreement.

8          THE COURT:  Employment agreement.

9          MR. REDNISS:  And the internal investigation.  Because

10  what happened where and his employment status is important to

11  this.

12          Mr. Rollins started working for Goldman Sachs Company

13  in July 2000.  After ten years, he was made a manager director,

14  and he signed an employment contract with Goldman Sachs Company

15  in New York.  That's the contract that contained this

16  arbitration provision.  In 2013, Mr. Rollins was assigned to

17  work for an affiliate of Goldman Sachs Services Limited in the

18  United Kingdom.  There's an assignment memo that says:  While

19  you're working in the UK, you will remain employed by Goldman

20  Sachs Company.

21          In August of 2016, the trades that ultimately wound up

22  being investigated occurred and failed to sell.  There is a

23  significant issue as to the existence of any applicable

24  restrictions relevant to those trades.

25          THE COURT:  Any what restrictions?

I9DHROlO

1          MR. REDNISS:  Restrictions, financial crimes

2     compliance restrictions, that were relevant to those trades and

3     may have been applied to the person we refer to as the

4     financier, which is a fairly notorious European businessman.

5          The issue of Mr. Rollins' employment status and the

6     identity of his legal employer is important because it appears

7     that Goldman Sachs Company in New York and Goldman Sachs

8     International in London had different standards, different

9     restrictions, or maybe in New York they had no restrictions at

10     all.  So what happened was on August 31, 2016, Mr. Rollins' UK

11     assignment came to an end.  His employer at that time

12     indisputably was Goldman Sachs Company in New York under the

13     managing director agreement.  If all of this had gone down in

14     August, we would not be saying what we're saying now.  But they

15     chose not to repatriate Mr. Rollins to the U.S.  And at the

16     time their initial concerns into his conduct were warranted.

17     They did not know that the transactions at issue had been

18     approved in advance by the firm's compliance department.

19          So instead of repatriating Mr. Rollins home, what they

20     did was they allowed him to stay in the UK.  He reported to

21     work --

22          THE COURT:  I'm sorry.  This is after August?

23          MR. REDNISS:  This is on, say, September 1, 2016.

24          THE COURT:  But you said that his employment ceased on

25     August 31, 2016.

I9DHRO1O

1          MR. REDNISS:  His three-year UK assignment to the UK

2     from Goldman Sachs Company in New York ended.  So at that point

3     in time, had he remained an at-will employee under the managing

4     director agreement, he would have moved back to New York.

5          THE COURT:  Maybe I'm missing something.  So as of

6     September 1, 2016, he was an employee of Goldman Sachs?

7          MR. REDNISS:  Yes.  So what happened is they said --

8     before his assignment had come to an end, they said:  Hey,

9     you're doing a great job.  When your UK assignment ends,

10     instead of going back to New York, you're going to get a new

11     employment contract in the UK.  You're going to stay and you're

12     going to become an employee of Goldman Sachs International,

13     which is the UK, London-based, broker-dealer.

14          So he stayed in New York.  He did not know --

15          THE COURT:  He stayed in London?

16          MR. REDNISS:  He stayed in London.  Sorry, your Honor.

17          He stayed on in London, and he was unaware that there

18     was an investigation that was underway related to the trades

19     and that was targeting him.  So on September 22, 2016,

20     Mr. Rollins gets a package of documents, the documents that

21     Mr. Rogers attaches as exhibit to his letter, the 16 pages.

22     And those 16 pages have -- there's a cover letter from Goldman

23     Sachs International that says:  This cover letter, together

24     with your previously signed manager director agreement,

25     together with the -- there's a two-page localization memo and

I9DHROlO

1    there's a UK annex, which purports to amend the managing

2    director agreement by tacking on terms that would subject him

3    to UK disciplinary policies, to the Financial Conduct

4    Authority, and the contract itself to English law.

5            Four days after he received these documents, which he

6    believed to be his contract, he was interviewed.  Four days

7    after that, he was suspended.  While he was --

8            THE COURT:  Did he execute the documents?

9            MR. REDNISS:  Excuse me?

10           THE COURT:  Did he execute the documents?

11           MR. REDNISS:  He did.

12           THE COURT:  When?

13           MR. REDNISS:  On September 22, 2016.

14           THE COURT:  And then submitted them to his employer?

15           MR. REDNISS:  He was in London.  Goldman Sachs

16   International sent them to him.  He signed them, gave them

17   back.

18           THE COURT:  OK.

19           MR. REDNISS:  He's then interviewed in the UK as part

20   of the investigation.  So clearly he was -- they were planning

21   to interview him and investigate him at the time.  So he

22   wasn't --

23           THE COURT:  They were planning to?

24           MR. REDNISS:  They were planning to investigate him.

25   They were preparing for an interview as part of their internal

I9DHROlO

1    investigation at the time when they gave him these documents.

2              THE COURT:  OK.

3              MR. REDNISS:  So what we think what happened is they

4    initially were going to give him a proper UK employment

5    agreement, as anybody else would have, and that's what the

6    localization memo says.  It says, and I'm reading from it now,

7    Employing Entity.  Your employment with Goldman Sachs & Co.

8    will terminate, and you will be employed by Goldman Sachs

9    International.  You will be issued with a new employment

10   agreement with Goldman Sachs International, which is a defined

11   term there as the agreement.

12             Defendants are trying to, it seems, argue that the old

13   agreement is an integrated agreement with these other

14   documents, and that together is his new UK employment

15   agreement.  Now, for a number of reasons, which I'll list in

16   one minute, we think that's impossible, both as a question of

17   the parties' intent and as a question of applicable UK law.

18             We can start with the plain language of the

19   localization memo which says on page 2 that this memo

20   supersedes everything else and the language on page 1 which

21   says, you're going to get a new employment agreement.  Now,

22   this had to be done for a good reason.  They had to supersede

23   the previous employment agreement that Mr. Rollins had with

24   Goldman Sachs Company because that agreement is a U.S.-based

25   agreement that calls for at-will employment in the U.S.  And,

I9DHROlO

```
 1    for example, the dispute resolution provisions which are at

 2    issue here requires arbitration as a sort of a cascade that

 3    starts with, in Section 8 of that contract, arbitration with

 4    FINRA.

 5          Now, you cannot integrate the managing director

 6    agreement into a UK-based employment agreement.  For one, the

 7    UK does not recognize the concept of at-will employment.  So

 8    you cannot employ Mr. Rollins on an at-will basis in the UK.

 9    The UK also has a prohibition against arbitrating employment

10    disputes that involve UK statutory rights or access to the UK

11    employment tribunal.  You can't contract out of that.  An

12    arbitration UK is completely different than it is here.  It's

13    very rarely used in the employment context.

14          You also have the issue that you have in any

15    cross-border plaintiff situation, which is the employee has, by

16    virtue of where he is, the protection of the home country laws.

17    You cannot contract out of that.  So when he was in the UK,

18    UK-based employees cannot be forced to arbitrate, first of all,

19    claims even in the UK involving statutory claims, but certainly

20    not claims in New York under New York law and certainly not

21    with FINRA, because unlike Goldman Sachs Company, which is the

22    party to the managing director agreement that we contend is

23    superseded, Goldman Sachs Company is, of course, a member of

24    FINRA and is based in New York; Goldman Sachs International is

25    a UK company and is not a FINRA member.
```

I9DHRO1O

1      THE COURT:  And this managing director agreement, you

2  say, creates an employee at-will relationship?

3      MR. REDNISS:  The managing director agreement states,

4  I believe, on page 1, it says in paragraph 1.1:  Your

5  employment will be at will.  This agreement is, of course,

6  governed by New York law.  So these terms are just

7  unenforceable in the UK.  And of course, Goldman Sachs Company

8  entered into that agreement with Mr. Rollins in 2010.  The

9  localization memo in that covering letter is six years later in

10  2016 with a completely different legal entity.

11      Now, I also want to bring up the point that this is

12  not an argument we came up with recently.  Mr. Rollins raised

13  this at the time.

14      THE COURT:  What time?

15      MR. REDNISS:  In October 2016.  He said:  You asked me

16  to sign these documents when I was -- when you knew you were

17  going to investigate me, and I believe that -- I don't believe

18  that I've been properly localized.  I don't believe that I have

19  a valid employment contract.  And he requested policies

20  applicable to New York employees, because no one had told him

21  what he was actually being investigated for.  So this is how he

22  started asking questions about what was going on, and the fact

23  that Goldman Sachs couldn't answer basic questions about who is

24  my legal employer, why is this happening in the UK, in

25  protesting the propriety of asking him to sign documents when

I9DHRO1O

1    they didn't intend to employ him, they intended to suspend him.

2            In response to that at the time --

3            THE COURT:  I'm sorry.  Let me stop you there.  So

4    does your position depend on Goldman Sachs' intent when they

5    sent him these documents that he signed on September 22?

6            MR. REDNISS:  No, it doesn't.  It doesn't because even

7    if -- I'm sorry.  Just pointing out the fact that they were

8    aware in their conduct in response to his complaint at the

9    time, what's going on with my employment status and contracts

10   is wrong, they then excluded the managing director agreement

11   and all of his employment documentation from the subsequent

12   disciplinary procedure.  So they ran a disciplinary process in

13   the UK under UK law that excluded his employment contract,

14   again, a point that he brought up at the time.

15           THE COURT:  What do you mean "that excluded his

16   employment contract"?

17           MR. REDNISS:  It was conducted -- the way it was

18   explained to him and the way the UK disciplinary process works,

19   as I understand it from talking to UK lawyers, is Goldman Sachs

20   has a disciplinary process that incorporates UK employment law.

21   So you're entitled to allegations that should be clear.  You're

22   given a record of documents and evidence that constitutes

23   everything that the decision-maker has to rely on as part of

24   the disciplinary process.

25           So throughout this process, we believe that once

I9DHROlO

Mr. Rollins questioned the propriety of what they were doing,

believing that they were trying intentionally to treat him as a

UK employee because they did not want to investigate from the

U.S. point of view why a U.S. employee and why Goldman Sachs

Co. had contacts with the same financier and had these issues

in the U.S.

We had significant additional evidence based on

defendant's conduct that they did not treat the managing

director agreement as the relevant employment contract because

it appears that now they're trying to say that Goldman Sachs

International, as reflected in the cover letter, employed and

terminated Mr. Rollins.  And we know that in November 2016,

they reported Mr. Rollins for what's called a conduct rule

violation in the UK to the Prudential Regulation Authority.  So

it's a UK regulator kind of like FINRA in the U.S.  And this

should have been part of the disciplinary process.  We believe

they excluded it because they effectively didn't have

jurisdiction.  He discovered that later.

THE COURT:  I'm sorry.  What precisely did they

exclude?

MR. REDNISS:  The conduct rule.  So they reported to a

UK regulator, the Prudential Regulation Authority, that James

Esposito had determined that Mr. Rollins had violated the UK

conduct rules.

THE COURT:  OK.

I9DHROlO

1          MR. REDNISS:  The conduct rules are a new set of rules

2     that were put in place for UK banks in March 2016 as part of

3     what was called the Senior Managers and Certification Regime,

4     and it's supposed to be linked through the disciplinary

5     process.  We believe that because of these issues relating to

6     the identity of his employment status, they knew they couldn't

7     make those findings, but they wanted to, as part of what we

8     believe is a cover-up, so they secretly reported him, and we

9     found it two months later.

10          THE COURT:  You're saying that Goldman Sachs used UK

11    rules and regulations when it suited them and is using U.S. law

12    now that it suits them?

13          MR. REDNISS:  That's exactly right.  At the same time

14    they were reporting to the Prudential Regulation Authority he

15    was an employ of GSI, in 2017 they reported to FINRA that he

16    had been an employee of Goldman Sachs Services Limited, and

17    then just six or seven months ago --

18          THE COURT:  Did they report to FINRA that he was an

19    employee of Goldman Sachs?

20          MR. REDNISS:  Services Limited.

21          THE COURT:  After September 1 of 2016?

22          MR. REDNISS:  Correct, through February 2017.

23          Then six months ago, in response to a reference that

24    Goldman Sachs had to give under the UK -- under the same Senior

25    Managers and Certification Regime, Goldman Sachs Services

I9DHRO1O

1   Limited sent the letter, which I have right here, that says we

2   were the ones that employed and terminated Mr. Rollins.  So no

3   matter --

4           THE COURT:  That's right, right?

5           MR. REDNISS:  Well, it's inconsistent with what they

6   say and it's inconsistent with their prospective intent for

7   Goldman Sachs International to invoke the arbitration provision

8   of the managing director agreement as part of what I think

9   they're claiming is an integrated employment contract.

10          THE COURT:  So let me just, because we do need to

11  finish at some point, you're saying that he should not be

12  subject to the arbitration agreement because he actually was an

13  employee of the UK entity, at least as far as some of the

14  representations that Goldman Sachs made, and UK law does not

15  provide for arbitration for the types of claims that you're

16  bringing?

17          MR. REDNISS:  Close.  We think he was always employed

18  as a matter of conduct by Goldman Sachs Company New York.  We

19  think their personnel ran the disciplinary process.  We know

20  they did.  We think Goldman Sachs Company terminated him.

21          So in three -- in short, our argument is this:  That

22  managing director agreement was superseded, had to be

23  superseded, because those terms are unenforceable under UK law.

24  No at-will employment, can't arbitrate claims, so there's no

25  employment agreement.  The parties continued, and we believe

I9DHROlO

1    that, one, showing that a different entity, Goldman Sachs

2    Services Limited, other than the one they're now claiming the

3    party to the employment agreement, obviously shows that they

4    too treated that managing director agreement as something they

5    could not rely on.

6         THE COURT:  When did he stop being an employee of

7    Goldman Sachs?

8         MR. REDNISS:  February 5, 2017.

9         THE COURT:  No, but your theory, that that agreement

10   was not valid?

11        MR. REDNISS:  We think what happened is that he was

12   employed by Goldman Sachs Company under his managing director

13   agreement.

14        THE COURT:  Until?

15        MR. REDNISS:  Until August 31, 2016.

16        THE COURT:  OK.

17        MR. REDNISS:  After that, what we believe is as a

18   matter of law, he was continued to be employed, he was dual

19   employed because he continued for that short period of time to

20   report to people in New York and to provide the same services

21   that he had.  The managing director agreement was specifically

22   superseded.  The new employment agreement that they promised

23   him was never given to him, so he did not have an employment

24   agreement.  So we think the conduct establishes that he

25   remained employed by Goldman Sachs Company New York, because

I9DHROlO

1    personnel terminated him, or at best he was dual employed,

2    which is what often happens in messy cross-border employment

3    disputes where the documentation doesn't line up, which is what

4    happened here.

5        THE COURT:  OK.  Let me, for purposes of this

6    proceeding, make believe that I understand all of that.

7    Mr. Rogers.

8        MR. ROGERS:  One way or another, your Honor, this man

9    is subject to an arbitration commitment.  He signed it when he

10   became a managing director at Goldman Sachs & Co.  And then in

11   September when he was converted over, and as it's been alleged

12   or as has been admitted, it was a routine process, he had a

13   three-year assignment as a GS & Co. employee; and then,

14   naturally, he was given what the complaint admits is his

15   employment contract, which is Exhibit B, an integrated

16   document.  It has an annex for UK terms of his managing

17   director agreement as the last three pages.

18       Now, we've heard a lot of speculation, much of it

19   paranoid, about how documents got created, but the short of it

20   is, your Honor, under the Federal Arbitration Act, this man

21   admittedly committed to arbitrate these claims.  These claims

22   are arbitrable.  There was some allegation by

23   plaintiff's counsel that a UK statutory claim may not be

24   arbitrable.  He's not making that.  He's not making a claim

25   under Form U5, by the way.  All he's claiming is this alleged

I9DHRO1O

| | |
|---|---|
| 1 | whistleblower speculation, which right now is just on the face |
| 2 | of the complaint, which if and when we're in arbitration, we'll |
| 3 | take care of there or elsewhere.  The claim for the CFTC |
| 4 | whistleblower allegation is legally meritless, factually |
| 5 | insubstantial, and should not drive an overall stay of this |
| 6 | proceeding. |
| 7 | The arbitration commitment he signed is valid.  And |
| 8 | under the precedents of this court, if there's any construction |
| 9 | under which arbitration should be granted, it should be.  So |
| 10 | that's essentially it, except that otherwise, alternatively, we |
| 11 | have our arguments that the claims are legally invalid. |
| 12 | THE COURT:  OK.  I think there's certainly more than |
| 13 | enough. |
| 14 | MR. REDNISS:  Can I respond briefly, return to that? |
| 15 | THE COURT:  Very briefly. |
| 16 | MR. REDNISS:  Thank you. |
| 17 | First, the allegations of the complaint are precisely |
| 18 | consistent with what we said today.  And the presumption of |
| 19 | arbitrability doesn't kick in until there's an existence of a |
| 20 | contract, and we know the contract was signed in 2010.  So we |
| 21 | think that the express language of that localization memo |
| 22 | saying, It's superseded; you're going to get a new agreement, |
| 23 | is about as clear as it gets and doubly reinforced by the |
| 24 | conduct of the parties because they never relied on it until |
| 25 | last week when they sent that letter. |

I9DHROlO

1           THE COURT:  OK.  Thirty days to make the motion.

2           MR. ROGERS:  That would be great.  Thank you, your

3     Honor.

4           THE COURT:  Thirty days to respond; two weeks to

5     reply.

6           MR. REDNISS:  Your Honor, if we could just get two

7     weeks to consider any amendments to the complaint?  This is our

8     only shot at doing that.  We don't want to lose it.

9           THE COURT:  Absolutely.  So two weeks, 30 days from

10    two weeks if you look at it and think that it's still deficient

11    in some manner, and then 30 days after that to respond and two

12    weeks to reply.

13          MR. ROGERS:  Thank you, your Honor.

14          MR. REDNISS:  Your Honor, we'd like to request that we

15    move ahead with discovery at this time because we don't believe

16    there's any basis to find an arbitration agreement exists.

17          THE COURT:  Denied.

18          Let's get those dates.

19          THE DEPUTY CLERK:  The motion is due October 15.

20          MR. ROGERS:  Two weeks to --

21          THE DEPUTY CLERK:  I'm sorry.

22          THE COURT:  Two weeks from the 27th.

23          THE DEPUTY CLERK:  Two weeks from the 27th?

24          THE COURT:  No, four weeks from the 27th.  I'm sorry.

25          THE DEPUTY CLERK:  October 25.  The motion is due

I9DHRO1O

1    October 25, the opposition is due November 30, and the reply is

2    due December 14.

3            THE COURT:  OK.  You all have those dates.  And

4    obviously, Mr. Rogers, if he does file an amended complaint and

5    you believe it's deficient, there's no need to file another

6    pre-motion letter; you can just follow that schedule.

7            MR. ROGERS:  Thank you very much, your Honor.

8            THE COURT:  Thank you, folks.  We're adjourned.

9    Looking forward to your papers.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25