**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| CHRISTOPHER ROLLINS,<br><br>　　　　　　　　Plaintiff,<br><br>- against -<br><br>GOLDMAN SACHS & CO. LLC,<br>GOLDMAN SACHS GROUP, INC.,<br>GOLDMAN SACHS INTERNATIONAL,<br>GOLDMAN SACHS SERVICES LIMITED, and<br>JAMES P. ESPOSITO,<br><br>　　　　　　　　Defendants. | Case No.  18-CV-7162 (ER) (GWG) |

---

### DECLARATION OF MARK HOWARD Q.C.

I, Mark Howard Q.C., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am a barrister and Queen's Counsel called to the bar of England and Wales.

2.    I submit this declaration on behalf of the First to Fourth Defendants, Goldman Sachs & Co. LLC, Goldman Sachs Group, Inc., Goldman Sachs International and Goldman Sachs Services Limited, in support of their Motion to Compel Arbitration.

3.    I consider in this declaration only matters arising out of the law of England and Wales ("English law").  I have been asked to assume, for purposes of my analysis of the matters I am addressing, that this is the law applicable to Mr Rollins' contract.

4.    The statements I make in this declaration are based on my personal knowledge and expertise except where otherwise stated.

## MY BACKGROUND

5.     I was called to the English Bar in 1980 and was appointed Queen's Counsel in 1996. I have practised throughout this time.

6.     I have appeared in many of the leading commercial cases over the last 40 years, including frequent appearances in the Supreme Court.

7.     The Legal 500 for 2018-2019 described me as *"Probably the leading commercial advocate at the Bar."* Recent cases I have appeared in include *Rainy Sky SA v. Kookmin Bank* [2011] 1 WLR 2900, one of the most cited Supreme Court cases on the interpretation of contracts.

8.     I am also Joint Head of Brick Court Chambers. Brick Court is one of London's leading sets of barristers' chambers, specialising in Commercial, Public and EU Law.

## MATTERS CONSIDERED

9.     I set out below:

(1)    A list of the documents I have reviewed;

(2)    A summary of the issues to be considered in this opinion;

(3)    A summary of my conclusions; and

(4)    The legal analysis in support of those conclusions.

## DOCUMENTS REVIEWED

I have reviewed the following key documents:

A.   Letter from Goldman Sachs International to Mr Rollins dated 6 September 2018, countersigned by Mr Rollins on 22 September 2016 (**"the Covering Letter"**);

B.   Managing Director Agreement, signed by Mr Lloyd Blankfein and Mr Rollins on 18 November 2010 (**"the MDA"**);

C.   A document entitled "Goldman Sachs Managing Director Agreement Revision Effective February 1, 2014" (**"the Addendum"**);

D.   Memorandum dated 6 September 2016, signed by Mr Rollins on 22 September 2016 (**"the Localization Memo"**);

E.   Annex to the Managing Directors Agreement, signed by Mr Rollins on 22 September 2016 (**"the Annex"**); and

F.   The Declaration of Mr Algazy Q.C. dated 30 November 2018.

I have also reviewed the following further documents:

G.   Letter dated 1 July 2013 relating to Mr Rollins' transfer to the United Kingdom, signed by Mr Rollins on 18 July 2013;

H.   Letter dated 7 November 2016 from Mr. James Esposito to Mr. Rollins;

I.   Letter dated 9 November 2016 from Ms. Leslie Reider to Mr Rollins;

J.   Mr Rollins' First Amended Complaint, dated 27 September 2018;

K.   The Defendants' Memorandum of Law in support of their Motion to Compel Arbitration, dated 25 October 2018; and

L.   Mr Rollins' Memorandum of Law in opposition to the Defendants' Motion to Compel Arbitration, dated 30 November 2018.

## ISSUES TO BE CONSIDERED

10.   I have been asked to provide an opinion on the effectiveness of the arbitration agreement contained in Clause 8.1 of the MDA, as a matter of English law. In particular, I am asked to consider:

(1)   Is the arbitration agreement in Clause 8.1 of the MDA void or unenforceable, as a result of the application of section 203(1) of the Employment Rights Act 1996 or s.144(1) of the Equality Act 2010; and

(2)   Assuming it is valid, is the arbitration agreement in Clause 8.1 of the MDA incorporated into Mr Rollins' contract of employment.

## SUMMARY OF CONCLUSIONS

11.   It is my clear view that:

(1)   The arbitration agreement in Clause 8.1 of the MDA is not rendered void or unenforceable by the provisions of the Employment Rights Act or Equality Act. In particular:

(a)   Properly interpreted, Clause 8.1 does not require arbitration of claims covered by s.203(1) of the Employment Rights Act or s.144(1) of the Equality Act.

(b)   In any event, if the Employment Rights Act or Equality Act did apply then they would only render the arbitration clause void or unenforceable "*in so far*" as the clause was inconsistent with those Acts. They would not render it void or unenforceable in its entirety.

(c)   Further and in any event, if Clause 8.1 of the MDA would otherwise be rendered void or unenforceable by the Employment Rights Act or the Equality Act, Clause 6.7 of the MDA would have the effect of limiting the scope of Clause 8.1 so that it remained valid.

(2)   The arbitration agreement in Clause 8.1 of the MDA is fully incorporated into Mr Rollins' employment contract. In particular:

(a)   Mr Rollins' employment contract consists of several documents, as set out in the Covering Letter, including the Covering Letter itself, the MDA and the Annex. There is therefore no need to "incorporate" Clause 8.1 of the MDA into the Annex.

(b)   In any event, Clause 8.1 would be incorporated into the Annex if required. The MDA and Annex form part of the same commercial relationship and specific words of incorporation referring to the arbitration clause are not necessary.

(c)   There is no inconsistency between Clause 8.1 of the MDA and the Annex that would prevent Clause 8.1 from being incorporated.

## LEGAL ANALYSIS

### INTRODUCTION

12. I first set out my analysis on the validity of the arbitration agreement in Clause 8.1 of the MDA, in light of Mr Algazy's argument that it is rendered invalid by s.203(1) of the Employment Rights Act 1996 or s.144(1) of the Equality Act 2010. I then consider the issues regarding incorporation, on the assumption the arbitration agreement is otherwise valid.

13. I assume throughout that English law is applicable to these questions.

### (1)   THE VALIDITY OF THE ARBITRATION CLAUSE

14. As a general rule, *"the policy of English law as articulated in the Arbitration Act 1996 is to give effect to the parties' choice to resolve their disputes by arbitration."* (Russell on Arbitration (24th Ed), para. 2-080). Section 1(b) of the Arbitration Act 1996 reflects this policy, stating that *"the parties should be free to agree how their disputes are resolved, subject only to such safeguards as are necessary in the public interest."*

15. It is against this background that the effect of s.203(1) of the Employment Rights Act 1996 (**"ERA"**) and ss.120 and 144 of the Equality Act 2010 fall to be assessed.

16. Section 203(1) of the ERA reads as follows:

    *"Any provision in an agreement (whether a contract of employment or not) is void in so far as it purports—*

    *(a) to exclude or limit the operation of any provision of this Act, or*

    *(b) to preclude a person from bringing any proceedings under this Act before an employment tribunal."*

17. Sections 120(1) and 144(1) of the Equality Act 2010 read:

> *"120   Jurisdiction*
>
> (1)   *An employment tribunal has, subject to section 121, jurisdiction to determine a complaint relating to—*
>
> > (a)   *a contravention of Part 5 (work)…"*

> *"144   Contracting out*
>
> (1)   *A term of a contract is unenforceable by a person in whose favour it would operate in so far as it purports to exclude or limit a provision of or made under this Act…"*

18.   In light of the terms of the MDA and this legislation, I am of the clear view that Clause 8 of the MDA is not rendered void by the ERA or unenforceable by the Equality Act. This is for three reasons.

19.   **First**, Clause 8.1 of the MDA expressly states that it only requires arbitration *"to the fullest extent permitted by law"*. Accordingly, it does not apply to disputes which are not permitted to be arbitrated by the applicable law. Accordingly, even if the ERA and Equality Act were applicable to the MDA, then Clause 8.1 could not require arbitration of disputes falling within the scope of s.203(1) and s.144(1).

20.   In my view an English court would give full effect to this wording, in line with the general principle that contracts should be interpreted to ensure that they are valid and lawful: see Lewinson, *The Interpretation of Contracts* (6th Ed), para. 7.16.[1] As Lord Justice Toulson (later a Justice of the Supreme Court of the United Kingdom) held in *Great Estates Group v. Digby* [2012] 2 All ER (Comm), para. 98:

> *"… if the contract is capable of being read in two ways, one of which would involve a contravention of a statute and the other would not, that may be a powerful reason for reading the contract in the sense which is compliant with the statute, even if it is the less natural construction. (This is to put in modern terms the approach expressed in the maxim ut magis valeat quam pereat.)"*

---

[1] The author, Kim Lewinson, is a Lord Justice of the Court of Appeal.

21. On the present facts the *more* natural construction of Clause 8.1 is that it does not require arbitration of disputes where arbitration is not permitted by law. It should be interpreted accordingly.

22. The issue of the application of s.203(1) of the ERA and s.144(1) of the Equality Act therefore does not arise, because if the Plaintiff had brought claims under those Acts – and I understand he has not done so – disputes that would engage s.203(1) and s.144(1) would not be within the scope of the arbitration clause.

23. **Second**, both the ERA and Equality Act expressly state that a term is void or unenforceable only *"in so far as"* it purports to limit the rights arising under the Acts. They do not state that a term is void *in its entirety* if it purports to restrict rights under the Acts in any way, as Mr Algazy appears to assume.

24. It follows that an arbitration clause that restricts access to the Employment Tribunal or otherwise infringes the Acts will be void only to the extent that it restricts such access, but is otherwise valid and enforceable. Further:

    (1) This is the only interpretation that gives proper effect to the express wording of the Acts. Mr Algazy's analysis overlooks the language used in the relevant sections and that they only declare a term to be void or unenforceable *"in so far as"* it restricts the rights arising under the Acts. Mr Algazy (in effect) interprets the legislation as saying that any term is rendered entirely void or unenforceable if it restricts, to any extent, the rights arising under the Acts. This is not what the Acts say.

    (2) It is also the only interpretation that avoids perverse results. If Mr Algazy were correct, then an arbitration clause in any agreement would need specifically to carve out from its scope any disputes caught by the ERA or Equality Act, or be void/unenforceable. Given the potential scope of application of the ERA and Equality Act, this would potentially invalidate a huge number of arbitration agreements.

    (3) Mr Algazy's alternative approach would undermine the law's policy of supporting arbitration and be contrary to the parties' expectations. Full effect can be given to

the terms of the ERA and Equality Act by finding that an arbitration clause cannot require a claim to be arbitrated where it arises under the Acts. There is no need to strike down the arbitration clause as a whole, in relation to a dispute which has nothing to do with the Acts.

25.     Moreover, the Employment Appeal Tribunal (which hears appeals on points of law from the Employment Tribunal) considered precisely this issue in the case of *Sutherland v. Network Appliance* [2001] I.R.L.R. 12. The parties had settled a dispute, agreeing a *"full and final settlement of any claims you may have against the Company arising out of your employment"*. The employee argued that this wording covered statutory claims arising under the ERA, as well as contractual claims. It further argued that this rendered the settlement void, since s.203(1) would strike down the entire agreement (or at least the entire clause). The Employment Appeal Tribunal rejected this argument in forthright terms, with the President finding at paragraph 9 that:

*"Nothing could have been easier for the legislature to say than that if an agreement contained any offending provision then the whole agreement would be void or, alternatively, that if a provision of an agreement contained any offending requirement then the whole provision would be void. But that was not done. Once one sees that there is not a general avoidance but only an avoidance "in so far as", it seems to us that Parliament was contemplating that agreements were intended to be capable of surviving in part even though struck out as to part. As Mr Napier points out, the Appellant's argument which we have cited above — namely that "Production R4 does not satisfy the terms of section 203 and therefore the contract stated in Production R4 is void" — is not justified by the Statute. Avoidance is only "in so far as" rather than total."*

26.     Accordingly, the Employment Appeal Tribunal held that the agreement remained valid as a settlement of the contractual claims. A copy of the decision is attached to this Declaration. This decision was later cited with approval in the judgment of the English High Court in *Re Britannia Heat Transfer Ltd (In Administration)* [2007] B.C.C. 470 at para. 10.

27. These cases are not mentioned by Mr Algazy, but they conclusively reject the argument he seeks to run.

28. The two authorities cited by Mr Algazy at paragraphs 25-27 of his legal analysis, *Clyde & Co LLP v. Bates van Winkelhof* [2011] EWHC 688 (QB), [2012] I.C.R. 928 and *Fulham Football Club (1987) Ltd v. Richards* [2012] Ch 333, do not provide any further assistance to his argument. As to these:

  (1) *Clyde & Co LLP v. Bates van Winkelhof* was a case in which a former partner of a law firm brought claims in the Employment Tribunal for sex discrimination and pregnancy discrimination. The law firm applied to stay those proceedings, to require compliance with a dispute resolution clause, which included an arbitration clause. Section 203(1) of the ERA and s.144(1) of the Equality Act were therefore directly engaged: the clause would prevent the partner continuing a claim in the Employment Tribunal, which the ERA and Equality Act permitted them to pursue. In the circumstances the application for a stay was refused. The court did not consider what the position would be if the employee's claim did not arise under the ERA or Equality Act.

  (2) Further, the commentary on *Bates van Winkelhof* in *Lindley & Banks on Partnership* (20th Edition), the leading practitioner's work on the topic, appears to consider that it only held an arbitration clause to be invalid as regards claims that were brought in the Employment Tribunal. At paragraph 8-15 the authors state that:

  *"Only an Employment Tribunal may entertain a claim for discrimination. It follows that if such a claim is raised by a partner, any arbitration clause in the partnership agreement will, <u>to that extent</u>, be void and unenforceable."* (emphasis added)

  (3) The case of *Fulham Football Club (1987) Ltd v. Richards* does not assist Mr Algazy's argument at all. In summary:

    (a) This was a case in which the petitioner presented an unfair prejudice petition (a type of complaint arising under company law), alleging that the football

10

league to which it belonged had acted prejudicially to its interest as one of its members. The parties had agreed to subject all disputes to arbitration.

(b)     The petitioner argued that the arbitration clause could not apply given that its unfair prejudice petition was not itself arbitrable.

(c)     The Court of Appeal rejected this argument and granted a stay in favour of arbitration, finding that the underlying *dispute* was arbitrable and that this was sufficient to require the parties to arbitrate the dispute under their agreement.

(d)     In the course of its judgment the Court briefly cited *Bates van Winkelhof*, stating at para. 41 that *"In relation to employment and discrimination, there are statutory restrictions on the enforceability of any agreement which excludes or limits an employee's access to the employment tribunal: see section 203 of the Employment Rights Act 1996 and section 144(1) of the Equality Act 2010 as discussed in Clyde & Co LLP v Van Winkelhof [2011] CP Rep 31."* However, it did not consider the application of ss.203(1) or 144(1) further.  Here, of course, the Plaintiff has not sought access to the employment tribunal.

(e)     Moreover, to the extent this judgment is relevant at all, it is to confirm that the English courts will support and enforce arbitration agreements and will reject technical arguments that seek to avoid arbitration. This further reinforces my view that the ERA and Equality Act would not be interpreted in the manner suggested by Mr Algazy.

29.     Accordingly, in my view neither the ERA nor the Equality Act would render Clause 8.1 void or unenforceable, as regards a claim which does not arise under those Acts.

30.     **Third**, even if the first two elements of the analysis above were rejected, Clause 6.7 of the MDA (which Mr Algazy does not mention) would ensure that Clause 8.1 remained effective. This clause provides that:

*"If any provision of the Employment Documentation is held by a court of competent jurisdiction to be invalid, illegal or unenforceable (whether in whole or in part), such provision will be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining such provisions will not be affected thereby…"*

31.   This clause was plainly intended to apply in precisely the situation that would arise if, contrary to the analysis above, Clause 8.1 would otherwise be void or unenforceable in its entirety due to the application of the ERA or Equality Act. Clause 6.7 serves to ensure that, insofar as necessary, Clause 8.1 would be modified so as to remove from its scope any non-arbitrable disputes which would otherwise render the clause invalid or unenforceable. The remaining clause, as modified, would not fall foul of the restrictions in the ERA or Equality Act. It would be straightforward to apply this clause on the present facts and the English courts would do so.

Conclusion on validity of Clause 8.1

32.   For the reasons set out above I am of the clear view that Clause 8.1 is valid under English law. Mr Algazy's analysis does not give adequate regard to the terms of Clause 8.1 or the wording of the relevant legislation, and overlooks Clause 6.7. When these matters are properly taken into account, there is no basis for declaring Clause 8.1 to be void or unenforceable.

## INCORPORATION OF THE ARBITRATION CLAUSE

33. Mr Algazy considers that the arbitration clause in Clause 8.1 is not adequately incorporated into Mr Rollins' contract, on the basis that (a) that MDA and the Annex are between different parties and there is not a sufficiently clear reference to Clause 8.1 to incorporate it into the Annex; and (b) the arbitration agreement in Clause 8.1 is inconsistent with the Annex, rendering it "inapt" for incorporation.

34. In my view both arguments are wrong. Clause 8.1 is clearly incorporated into the relevant agreement, for the reasons that follow.

Documents forming part of Mr Rollins' contract

35. As a preliminary point, I disagree with Mr Algazy's assertions that the Annex (which Mr Algazy describes as the "GSI Terms") constitutes the entirety of the employment contract between GSI and Mr Rollins (paragraph 2 of Mr Algazy's legal analysis).

36. On the contrary, in my view Mr Rollins' employment contract consists of the following documents:

    (1)   The Covering Letter;

    (2)   The MDA;

    (3)   The Annex;

    (4)   The Addendum; and

    (5)   The Localization Memo.

37. This is clear in light of the following points:

    (1)   The Covering Letter, which is signed for GSI and countersigned by Mr Rollins, states that:

*"I attach a copy of your GSI annex which, together with your previously signed Managing Director Agreement, the Addendum thereto, this letter and the localization memo dated 6 September 2016 represents the entire understanding of the parties with respect to the matters set forth therein and will supersede any other agreement, written or oral, pertaining to such matters."*

It was therefore expressly stated that Mr Rollins' contract was constituted by each of these documents. It is impossible to read the Covering Letter as providing that Mr Rollins' contract consists solely of the Annex, with no regard to any of the other documents referred to.

(2)     The Annex describes itself as being an *"Annex to the Managing Director Agreement"*. It does not purport to be a freestanding agreement. Rather, it is the component of Mr Rollins' contract that sets out certain particulars which are required to be provided under the ERA (as is stated in the opening sentence of the Annex), together with certain terms specific to Mr Rollins' employment in the UK.

(3)     Further, it is clear from the substance of the Annex that it does not set out the full terms of Mr Rollins' contractual relationship with GSI. It does not include terms that would be central to any agreement between GSI and one of its Managing Directors. These include, for example, terms relating to confidentiality, non-competition and non-solicitation. These terms are set out in the MDA at Clauses 3, 4 and 5. Similarly, the Annex does not contain a dispute resolution clause: this term, Clause 8.1, is set out in the MDA as well. It is self-evident that the parties cannot have intended the Annex to apply in isolation, ignoring the MDA.

(4)     In any event, the MDA states expressly in its opening words that it can apply as an agreement between *"The Goldman Sachs Group, Inc. ("GS") or one or more of its subsidiaries and affiliates"*. The counterparty to the MDA is thereafter described as the *"Firm"*. The MDA is therefore capable of applying to govern the relationship between any subsidiaries and affiliates of The Goldman Sachs Group, Inc. and a Managing Director, as well as being capable of governing a contract between The Goldman Sachs Group, Inc. *itself* and the Managing Director. The MDA further

expressly envisages that it will be supplemented by further documents, stating in Clause 10 that the definition of *"Employment Documentation"* includes *"The Managing Director Agreement and any Statement of Terms and Conditions of Employment provided to you"*. It was therefore envisaged that the contractual relationship could consist of the MDA and an annex, such as that issued by GSI. Taken in the round, it is clear that the MDA sets out the core terms of the Managing Director's employment, to be supplemented by further specific terms as appropriate. There is therefore no difficulty in finding that the MDA applies as part of Mr Rollins' agreement with GSI, as set out in the Covering Letter.

38. I therefore consider that Mr Algazy is wrong to assert that the Annex *"sets out the four corners of Mr Rollins' English Employment contract"* (paragraph 5). The Annex sets out only some of those terms. Other terms are found in the other documents referred to in the Covering Letter, including the MDA.

39. A linked point is that Mr Algazy is wrong to state, at page 9 of his declaration, that the relevant parties to the MDA are Mr Rollins and The Goldman Sachs Group, Inc. Rather:

   (1)  The parties to the MDA are stated to be Mr Rollins and *"The Goldman Sachs Group, Inc. ("GS") or one or more of its subsidiaries and affiliates"*. The actual counterparty to the MDA will depend on the identity of the Goldman Sachs entity that employs the Managing Director from time to time.

   (2)  It appears from the letter of 1 July 2013 that Mr Rollins was employed by Goldman, Sachs & Co. prior to his transfer to GSI. This letter states expressly that *"you will remain an employee of Goldman, Sachs & Co."* during the initial assignment to London.

   (3)  This position then changed in 2016, when Mr Rollins was transferred to GSI. Localization Memo states expressly that *"[y]our employment with Goldman, Sachs & Co. will terminate and you will be employed by Goldman Sachs International."*

   (4)  As is noted above, the MDA constitutes the core terms of the contract between Mr Rollins and the Goldman Sachs entity that employed him from time to time. It

therefore appears that the MDA was between Mr Rollins and Goldman, Sachs & Co. from (at least) 2013 until 2016. Once Mr Rollins' employment by Goldman, Sachs & Co. had terminated in September 2016 and he became employed by GSI, as stated in the Localization Memo, the relevant parties to the MDA became Mr Rollins and GSI from that point.

40.   It is against this background that the issue of whether Clause 8.1 is incorporated into Mr Rollins' agreement must be considered.

Clause 8.1 is incorporated into Mr Rollins' employment contract

41.   I consider that Clause 8.1 is clearly incorporated into Mr Rollins' employment contract. For the reasons set out above, Mr Rollins' contract consists of the Covering Letter and the documents referred to therein, including the MDA. Clause 8.1 forms part of the MDA. Accordingly, Clause 8.1 forms part of Mr Rollins' contract.

42.   Mr Algazy's analysis, by contrast, starts from the mistaken premise that Mr Rollins' contract consists solely of the Annex (referred to in Mr Algazy's declaration as the "GSI Terms"), into which the MDA must be incorporated. This is mistaken for the reasons set out above: there is simply no need to "incorporate" Clause 8.1 into the Annex, as the Annex and the MDA already both form part of Mr Rollins' contract. Some terms are set out in the Annex, but many others (including the dispute resolution clause) are set out in the MDA.

43.   Indeed, it would scarcely make sense to refer to the "Annex to the Managing Director Agreement" (to give the Annex its full title) as "incorporating" terms of the MDA. This gets the structure of the agreements backwards: the Annex supplements the MDA, not the other way round.

44.   Mr Algazy also assumes that the MDA is between different parties to the Annex, on the basis that the MDA is between Mr Rollins and The Goldman Sachs Group, Inc. and the Annex is between Mr Rollins and GSI. This is also mistaken. As is stated in the Covering Letter, once Mr Rollins became employed by GSI his contract consisted of both the MDA

and the Annex, with the MDA then being constituted (in accordance with its terms) as an agreement between Mr Rollins and GSI. This was expressly envisaged by the opening words of the MDA, which refer to it as setting out *"certain terms and conditions of your employment as a Managing Director of The Goldman Sachs Group, Inc. ("GS") or one or more of its subsidiaries and affiliates…"*

45.   Thus, even if the MDA *was* a separate agreement, which was required to be incorporated into the Annex, the arbitration clause would be incorporated without difficulty. The Annex's express statement that it was an *"Annex to the Managing Directors Agreement"* would be sufficient to incorporate the MDA's terms, including Clause 8.1.

46.   However, in the very unlikely event that an English Court accepted the premise that it was necessary to incorporate the MDA into the Annex, *and* that the MDA and Annex were between different parties, I do not consider that there would be any difficulties with incorporating the arbitration clause on the facts of this case:

   (1)   Whether the arbitration clause is incorporated will depend on the parties' intentions, assessed objectively. As Mr Algazy notes at paragraph 42 of his declaration, *"the imputed mutual intention of the parties has to be arrived at by general principles of construction applicable to any other contractual term."* (*Excess Insurance Company Limited v. Mander* [1997] 2 Lloyd's Rep. 119 at 124 per Colman J).

   (2)   In cases of contracts between entirely unconnected parties this may require an express reference to the arbitration clause before the arbitration clause will be incorporated. The reason for this requirement is obvious: if this clause arises under a distinct agreement between different parties then adequate notice of the existence of the clause should be given before it is incorporated, since *"the other party may have no knowledge nor ready means of knowledge of the relevant terms"* (*Sea Trade Maritime Corporation v. Hellenic Mutual War Risks Association (Bermuda) Limited, The Athena (No.2)* [2007] 1 Lloyd's Rep. 280 at para. 65 per Langley J).

   (3)   But a specific reference is not required where this rationale does not apply. As is set out in *Russell on Arbitration* (24th Edition) at para. 2-050:

*Recently, the courts appear to have extended the "single contract" principle applicable to standard form contracts, where general words of incorporation will suffice, to other types of contract where the same rationale can be said to apply. Thus, if the document sought to be incorporated is a bespoke contract between the same parties, the courts have accepted this as a "single contract" case where general words of incorporation will suffice, even though the other contract is not on standard terms and constitutes an entirely separate agreement. The rationale for this approach is that the parties have already contracted on the terms said to be incorporated and are therefore even more likely to be familiar with the term relied on than a party resisting incorporation of a standard term. Put another way, if general words of incorporation are sufficient for the latter, they should be even more so for the former. <u>The courts also appear to have accepted as a "single contract" case a situation where the contract referred to is between one of the parties to the original contract and a third party, where the contracts as a whole "were entered into in the context of a single commercial relationship"</u>.* (emphasis added)

(4)   The facts of this case clearly fall within the category of close *"commercial relationships"*, which justify the incorporation of an arbitration clause without a specific reference. The parties are not unconnected. Mr Rollins is (on any view) party to both agreements. Even on Mr Algazy's analysis that the counterparty to the MDA is The Goldman Sachs Group, Inc. and the counterparty to the Annex is Goldman Sachs International, both these parties form part of the same group – defined in the MDA as "the Firm" and used as a defined term in the Annex – and the sole reason for the change of party is Mr Rollins' transfer of employment within that group. The MDA plainly forms part of the same *"commercial relationship"* as the Annex (which describes itself as an *"Annex to the Managing Director Agreement"*) and Mr Rollins and GSI would have been fully aware of the terms of the MDA.

(5)   Accordingly, the rationale for requiring an express reference to the arbitration clause, which sometimes applies in cases of contracts between unconnected parties, simply does not apply in this case. It is sufficient, to incorporate the arbitration

clause in the MDA, to find that the parties intended the Annex to be read together with the MDA including its arbitration clause. This requirement is clearly met on the facts.

47. For all these reasons I do not consider there to be any difficulty in concluding that the arbitration clause in Clause 8.1 forms part of the contract with Mr Rollins.

## The arbitration clause is consistent with the Annex

48. Mr Algazy's final argument is that the arbitration clause in Clause 8.1 is *"inapt for incorporation"* into the Annex, apparently on the basis that it is inconsistent with the Annex's terms.

49. As a general rule, it is correct that an arbitration clause will only be incorporated by reference if it can properly be applied in the context of the parties' agreement. However, the Courts are not overly strict about this requirement: in an appropriate case a degree of 'manipulation' or 'adaptation' of the clause may be undertaken, if necessary, to give effect to the parties' intentions: *The Rena K* [1979] QB 377 at 390-391. The issue normally arises where there is some linguistic mismatch between the arbitration clause that is sought to be incorporated and the agreement between the parties, as where the arbitration clause is found in a charterparty and provides for arbitration of disputes *"arising out of this charter"* and there is an attempt to incorporate the clause into a bill of lading.

50. In my view the arbitration agreement in Clause 8.1 is fully consistent with the Annex. I note the following points.

51. **First,** the only complaint that Mr Algazy makes about the arbitration clause itself (as opposed to other clauses in the MDA) is that it provides for arbitration according to the rules of FINRA. Mr Algazy suggests this does not make sense as this would *"subject the employee to a wholly inappropriate set of rules pertaining to the regulatory framework to which Mr Rollins was not subject in respect of his work in the UK"* (paragraph 56). This argument appears to be misconceived, for several reasons:

(1)   I understand the FINRA "rules" referred to in Clause 8.1 to be procedural rules, governing arbitrations conducted under the auspices of FINRA. These are therefore analogous to the rules of the International Chamber of Commerce (**"ICC"**) or London Court of International Arbitration (**"LCIA"**), which are very commonly chosen to arbitrate disputes. Clause 8.1 does not (as Mr Algazy appears to assume) necessarily import the substantive rules of the regulatory regime operated by FINRA. The argument therefore fails at the first hurdle.

(2)   In any event, there is no suggestion that FINRA would find it difficult to apply English law regulatory principles, to the extent required. If it was necessary to consider the rules of the UK Financial Conduct Authority or Prudential Regulation Authority, as Mr Algazy suggests (paragraph 57), evidence on these matters could be given. English arbitrators and Courts are fully capable of taking into account rules of foreign regulatory systems (e.g. the rules of the United States Securities and Exchange Commission) where appropriate and I am not aware of any reason why a FINRA arbitrator could not do the same.

(3)   Further and in any event, if (exceptionally) FINRA arbitration was inappropriate for any reason, Clause 8.1 makes provision for FINRA to decline to accept the reference, in which case the arbitration will instead take place before the American Arbitration Association in accordance with the commercial arbitration rules of the AAA. Mr Algazy does not suggest that this would be inappropriate or unworkable in any way.

(4)   I would also note that the alleged inconsistency identified by Mr Algazy is very different to the type of inconsistency that usually arises in the cases. These concern difficulties in the *wording* of an arbitration clause which provides for arbitration of disputes under a specific agreement (e.g. a charterparty) and is then purportedly incorporated into another agreement (e.g. a bill of lading). This issue does not arise under Clause 8.1, which provides that it covers *"...any dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters...".* This language is capable of covering disputes under the Annex without any manipulation or adaptation at all.

52.   I therefore do not consider there to be any inconsistency between Clause 8.1 and the Annex.

53.   **Second**, the other purported inconsistencies that Mr Algazy identifies are not related to Clause 8.1 and the arbitration clause, but instead relate to other terms of the agreement. In any event, his complaints are overstated. In summary:

(1)   Mr Algazy identifies that the choice of law clause in Clause 13 of the Annex provides for *"the terms and conditions of your UK-specific employment, as set forth in this statement"* to be governed by English law, whereas the choice of law clause in Clause 9.4 of the MDA provides for the MDA to be governed by the laws of the State of New York (paragraph 61 of his Declaration). To the extent there is any inconsistency here, it would be resolved by the relevant court (or tribunal) applying its choice of law rules. In any event, the answer to this question is separate from the issue of whether the arbitration clause in Clause 8.1 of the MDA is consistent with the Annex. At least from an English perspective, I cannot see that a potential conflict between the two choice of law clauses would prevent the arbitration clause from being applied according to its terms.

(2)   Mr Algazy asserts at paragraphs 60 of his declaration that the jurisdiction clause in Clause 9.2 of the MDA would be invalid as a matter of English law, because of the restrictions on jurisdiction clauses in employment contracts set out in the Recast Brussels Regulation (i.e. the EU Regulation setting out the jurisdiction rules applicable to certain disputes in the United Kingdom). He suggests that this requires *"significant alteration"* of Clause 8 and Clause 9 to render them applicable to Mr Rollins' contract (paragraph 60; see also paragraph 51). I disagree. There is no inconsistency here that could affect the arbitration agreement in Clause 8.1:

(a)   Most of Clause 9.2 concerns a submission to the *"federal courts located in the City of New York"* in cases *"not otherwise arbitrated or resolved according to the provisions of Clause 8 above"*. By definition, this part of Clause 9.2 therefore does not apply where Clause 8.1 is applicable. It

therefore cannot generate an inconsistency between Clause 8.1 and the Annex.

(b)   Only the second sentence of Clause 9.2, providing for the submission to the federal courts in New York in relation to *"any suit, action or proceeding to compel arbitration or to enforce an arbitration award"*, potentially affects Clause 8.1. However, the Recast Brussels Regulation expressly does not apply to arbitration agreements, including any *"ancillary proceedings relating to, in particular, the establishment of an arbitral tribunal, the powers of arbitrators, the conduct of an arbitration procedure or any other aspects of such a procedure, nor to any action or judgment concerning the annulment, review, appeal, recognition or enforcement of an arbitral award"*: see Recital 12 and Article 2(d). The effect of the second sentence of Clause 9.2 of the MDA is to confer supervisory jurisdiction on the federal courts in New York in relation to the arbitration provided for in Clause 8.1, and this is fully permitted under the Recast Brussels Regulation.

54.   Accordingly, there is no inconsistency between Clause 8.1 of the MDA and the Annex. Clause 8.1 can be incorporated into the Annex (if necessary) or otherwise apply to disputes arising under Mr Rollins' contract with GSI.

## OVERALL CONCLUSION

55.   For the reasons set out above, I am of the clear view that as a matter of English law:

(1)   Clause 8.1 of the MDA is not rendered void or unenforceable as a result of the Employment Rights Act 1996 or the Equality Act 2010;

(2)   Clause 8.1 of the MDA forms part of Mr Rollins' contract of employment.

56.   I confirm that I understand that my overarching duty is to the Court and not to the party instructing me in giving this declaration.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is correct.

Executed this 14th day of December 2018.

MARK HOWARD Q.C.

**Brick Court Chambers**

**7-8 Essex Street**

**London**

**WC2R 3LD**

------------------------

1693732