UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER ROLLINS,

                          Plaintiff,

            - against -

GOLDMAN SACHS & CO. LLC,
GOLDMAN SACHS GROUP, INC.,
GOLDMAN SACHS INTERNATIONAL,
GOLDMAN SACHS SERVICES
LIMITED, and JAMES P. ESPOSITO,

                          Defendants.

**OPINION AND ORDER**

18 Civ. 7162 (ER)

---

Ramos, D.J.:

      Christopher Rollins brings this action against his former employer Goldman Sachs Group ("GS Group"), certain of its subsidiaries, and James P. Esposito (collectively, "Goldman Sachs"). Amended Complaint ("Am. Compl."), Doc. 17. Rollins, a former managing partner at GS Group, alleges that Goldman Sachs retaliated against him when he blew the whistle on the Firm's concealment of anti-money laundering ("AML") compliance failures associated with a European businessman (the "Financier"). In the instant motion, Goldman Sachs moves to compel arbitration pursuant to Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*. Doc. 20. For the reasons set forth below, Goldman Sachs' motion to compel arbitration is GRANTED.

**I.    BACKGROUND**

    **A.  Factual Background**

      Rollins is a former employee of Goldman Sachs & Co. LLC ("GSCO"), which is a company owned and controlled by GS Group, and has its principal place of business in New York City. Am. Compl. ¶¶ 1, 29, Doc. 17. GS Group is also the parent of Goldman Sachs

International ("GSI"), a British company.  *Id.* ¶¶ 28, 31.  After graduating from Harvard University in 2000, Rollins started his career at GSCO's Securities Division in NY.  *Id.* ¶ 33; Defendants' Memorandum in Support of Motion to Compel Arbitration ("Defs.' Memo") at 4, Doc. 21.  In 2010, Rollins was promoted to managing director, effective January 1, 2011.  Defs.' Memo. at 4, Doc. 21.

In connection with the promotion, Rollins and GS Group entered into an employment contract.  The contract included an attachment titled Managing Director Agreement ("MDA"), which was dated January 1, 2011 and governed by New York law.[1]  Am. Compl. at 8, n.3, Doc. 17; Rogers Decl., Ex. A, Doc. 22.  The arbitration and choice of law clauses included in the MDA provide:

> 8.1. Subject to Section 9 below, and to the fullest extent permitted by law, any dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters will be finally settled by arbitration in New York City before, and in accordance with the rules then obtaining of, the Financial Industry Regulatory Authority ("FINRA").  If FINRA declines to arbitrate the matter, the matter will be arbitrated before the American Arbitration Association ("AAA") in accordance with the commercial arbitration rules of the AAA.  You agree that any arbitration decision and/or award will be final and binding upon the parties and may be entered as a judgment in any appropriate court.
>
> . . .
>
> 9.4 The Managing Director Agreement will be governed by and construed in accordance with the laws of the State of New York, without reference of conflict of laws.

Rogers Decl., Ex. A, Doc. 22.

In 2013, Rollins accepted a three-year work assignment in London, which was scheduled to conclude on August 31, 2016.  Am. Compl. ¶¶ 33, 55, n.3, Doc. 17.

---

[1] The MDA was signed by both Rollins and Lloyd C. Blankfein, the Chairman and Chief Executive Officer of GS Group.  Rogers Decl., Ex. A.  Rollins' signature was dated November 18, 2010.  *Id.*

1. **Business dealings with the Financier**

Rollins' complaint is based on a series of interactions and business transactions that occurred during his work assignment in London with the Financier, a businessman who claimed to have raised $1 billion to invest. *Id.* ¶ 37. According to Rollins, the transactions stemmed from a meeting between the Financier and Goldman Sachs senior bankers, Michael Daffey and John Storey, in August 2015. *Id.* ¶ 2. Rollins claims that between September 2015 and August 2016, Daffey and Storey allegedly steered a series of transactions linked to the Financier past AML controls. *Id.* ¶ 4.

Specifically, Rollins claims that on July 18, 2016, he was contacted by the Financier regarding a single trade worth more than $400 million ("Company A transactions"). *See* Defs.' Memo. at 5–6, Doc. 21; *id.* ¶ 41. He further claims that Goldman Sachs' Firmwide Commitment Committee initially would not approve the transaction but ultimately "greenlit" it. Am. Compl. ¶ 44, Doc. 17. Then, on August 3, 2016, the Financier contacted Rollins regarding a new set of potential trades for securities of a European company ("Company B" transactions). Defs.' Memo. at 6, Doc. 21. The Financier was to "make[] introductions" to a number of Goldman Sachs' clients, but according to the Amended Complaint, Rollins "knew that . . . introductions had the potential to be improperly pre-arranged trades." Am. Compl. ¶ 48, Doc. 17. Rollins alleges that he consulted with a divisional employee in Goldman Sachs' Compliance Division prior to commencing the Company B trades. *Id.* ¶ 49.

Between August 3 and 18, 2016, Rollins arranged eight trades of Company B securities. Def Memo. at 6, Doc. 21. However, later that month, one of Goldman Sachs' clients did not pay for a number of its Company B trades, and this settlement failure exposed the company to an $85 million loss. *Id.* ¶ 55. After this incident, the Financial Crimes Compliance ("FCC") division

3

(oversight of which includes AML) became concerned that the settlement failures were part of an illegal scheme to execute pre-arranged trades. *Id.* ¶ 6. This incident caused Goldman Sachs to begin an investigation into Rollins' involvement with the Financier. *Id.*

### 2. Employment in London

During this time, the end of Rollins' three-year London assignment was coming to an end in August 2016. *Id.* ¶ 55. Rather than return to New York, Rollins decided to transfer as managing partner in London on a long-term basis for the Firm's U.K. affiliate, GSI. *Id.* ¶¶ 55, 56. In accordance therewith, GSI included as part of Rollins' U.K. employment contract the very same MDA that he had signed in 2011. *See* Rogers Decl., Ex. A, B, Doc. 22.

Rollins' U.K. Employment Contract with GSI, dated September 6, 2016, was comprised of four documents: (1) a cover letter confirming that Rollins' employment with GSI began on September 1, 2016 and describing that the agreement, including the three attached documents, "represents the entire understanding of the parties with respect to the matters set forth therein."; [2] (2) the MDA Rollins signed in 2011, which included the arbitration clause and the choice of law provision; (3) a letter confirming U.K. benefits and other terms of employment ("Localization memo"); and (4) a document titled "Annex to the Managing Director Agreement/Statement of terms and conditions of employment in the United Kingdom." ("Annex"). *See id.*, Ex. B.

### 3. Disciplinary investigation and termination decision

Just a few days after Rollins signed his U.K. employment contract, on September 26 and 30, 2016, Goldman Sachs interviewed Rollins as part of the investigation into the dealings with the Financier, and also suspended his employment. Defs.' Memo. at 7, Doc. 21. At the conclusion of the investigation, GSI initiated a disciplinary hearing, for which Esposito was

---

[2] Rollins signed the cover letter of the U.K. Employment Contract on September 22, 2016. Rogers Decl., Ex. B, Doc. 22.

4

appointed as the hearing officer and disciplinary chair.  *Id.*  According to Goldman Sachs, the hearing was mandated by U.K. law.  *Id.*  Rollins claimed during this investigation that he was not aware of any compliance restrictions relating to the Financier.  Am. Compl. ¶ 8, Doc. 17.

The disciplinary hearing was held on October 27, 2016.  Defs.' Memo. at 7, Doc. 21.  Rollins claims that during the process, he had to resist Goldman Sachs' "pressur[e]" "to confess to violating compliance restrictions relating to Financier."  Am. Compl. ¶¶ 15, 16, Doc. 17.  On November 7, 2016, Esposito issued a letter terminating Rollins and explaining his decision therefore.  The termination date was set at February 5, 2017.  Defs.' Memo. at 7–8, Doc. 21.  In the letter, Esposito found that Rollins breached compliance restrictions in connection with the Financier.  *Id.*  Specifically, Esposito explained that Rollins neither discussed the transactions with the FCC or other senior management, nor alerted the Compliance Division employee to the fact that the Financier was subject to FCC and senior management restrictions.  *See* Rogers Decl., Ex. C at 1, Doc. 22.

Goldman Sachs subsequently filed two regulatory notifications required by law:  (1) on November 15, 2016, GSI submitted Form L with the Prudential Regulation Authority ("PRA," one of GSI's U.K. regulators); and (2) on March 7, 2017, GSCO filed Form U-5 (with Form L) with the Financial Industry Regulatory Authority ("FINRA") regarding the termination of Rollins' employment and termination of his registration with FINRA.  Defs.' Memo. at 8, Doc. 21.

On December 4, 2016, a month after the decision to terminate him, Rollins filed an internal report of potential violations of U.S. law with the Firm's U.S. and U.K. legal departments ("2016 internal report").  Am. Compl. ¶ 18, Doc. 17.  He then filed a second internal report in February 2017 ("2017 internal report").  *Id.* ¶ 91.  Rollins also filed Form Tip,

5

Complaint, Referrals ("Form TCRs"), first to the Commodity Futures Trading Commission ("CFTC") on April 4, 2017, then to Securities Exchange Commission ("SEC") on April 11, 2017.  *Id.* ¶ 19.  However, Rollins did not notify Goldman Sachs of these regulatory filings until March 19, 2018.  Def. Memo. at 17, Doc. 21.

As a result of the investigation and alleged misconduct, the committee responsible for implementing Goldman Sachs' Stock Incentive Plan ("SIP"), of which Rollins was a participant, determined that Rollins engaged in conduct constituting "cause" as defined in the SIP.  *Id.* at 9.  Rollins was therefore made to forfeit some of his unvested and vested equity awards.  *Id.*

### 4. Employee referral letter

According to Rollins, after his termination, a prospective employer contacted GSSL on April 24, 2018 "to request a regulatory employment reference."  Am. Compl. ¶ 98, Doc. 17.  Rollins alleges that on May 15, 2018, Goldman Sachs provided the following response:

> In November 2016, following a disciplinary meeting, Chris Rollins's employment was terminated for failing to act with due skill, care and diligence.  The firm had restricted business with a particular counterparty by not permitting it to open an account for execution due to compliance concerns, which were conveyed to Chris.  He however permitted the principal of that counterparty to introduce and arrange trades a short time later in August 2016, without the approval of or guidance from Compliance or senior management knowledgeable about the relevant concerns.

*Id.* ¶ 100.  Goldman claims that the PRA requires firms to disclose in the reference letter to prospective employers "all information of which the former employer is aware that is relevant to the prospective employer's assessment of whether the prospective employee is fit and proper."  Defs.' Memo. at 18, Doc. 21.

### B. Procedural Background

Rollins filed the instant action on August 9, 2018.  Doc. 1.  On September 27, 2018, Rollins filed an Amended Complaint invoking federal-question jurisdiction under 28 U.S.C. §

6

1331, and supplemental jurisdiction under 28 U.S.C. § 1367.  He alleges claims brought under: (1) Dodd-Frank's SEC anti-retaliation provision ("SEC claim"), 7 U.S.C. § 26(h)(1)(B)(i); (2) Dodd-Frank's CFTC anti-retaliation provision ("CFTC claim"), 15 U.S.C. § 78u-6(h)(1)(A); (3) fraudulent inducement; and (4) defamation.  Doc. 17.

Rollins' SEC and CFTC claims are based on assertions that Goldman Sachs retaliated against him, and that he is a whistleblower who is entitled to protection under the Dodd-Frank Act.  Am. Compl. ¶¶ 109–111, Doc. 17.  Regarding the fraudulent inducement claim, Rollins alleges that the U.K. employment contract was a "self-serving document" primarily intended to confer jurisdiction over Rollins for purposes of GSI's investigation, while removing traces of the links between Rollins, GS Group, and GSCO.  Id. ¶¶ 132–33.  Rollins further claims that the U.K. contract was intended to make Rollins a U.K. employee for purposes of retroactive application of U.K. policy rules.  Id. ¶ 134.  The defamation claim is based on Goldman Sachs' response to the employment referral request.  Id. ¶¶ 139–142.  Rollins alleges that Goldman Sachs sent the potential employer a false and defamatory employment reference, intending to bar Rollins from being hired for a senior role in the U.K.  Id. ¶ 99.

On October 25, 2018, Goldman Sachs moved to compel arbitration and, in the alternative, dismiss the complaint pursuant to Rule 12(b)(6).  Doc. 20.  In support thereof, Goldman Sachs contends that:  (1) Rollins is a party to a valid and enforceable arbitration clause that precludes his attempt to assert claims; (2) Rollins' federal law claims under Dodd-Frank Act are defective as a matter of law, and they should thus be dismissed; and (3) the court should decline to exercise supplemental jurisdiction over his state law claims of fraudulent inducement and defamation.  Doc. 21.

In response, Rollins claims that: (1) the arbitration clause is void and illegal under English law; (2) the arbitration clause was not validly incorporated into the employment contract; and (3) his Dodd-Frank whistleblower claims and state law claims should be sustained. Doc. 23.

## II.   LEGAL STANDARD UNDER THE FEDERAL ARBITRATION ACT

Under the Section 4 of the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects a liberal federal policy favoring arbitration agreements, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (internal citation and quotation marks omitted), and places arbitration agreements on "the same footing as other contracts." *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 118 (2d Cir. 2012) (internal citation omitted).

"In deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (internal citation omitted). "It is the court's duty to interpret and construe an arbitration clause, but only where a contract is validly formed and legally enforceable." *Kulig v. Midland Funding, LLC*, 13 Civ. 4715 (PKC), 2013 WL 6017444, at *2 (S.D.N.Y. Nov. 13, 2013) (internal citation and quotation marks omitted). The FAA requires courts to compel arbitration in accordance with the terms of an arbitration agreement upon the motion of either party to the agreement, provided that there is no issue regarding its creation. *See AT&T Mobility LLC* 563 U.S. at 354–355 (citing 9 U.S.C. § 4). Parties are not required to arbitrate unless they have agreed to do so. *See Schnabel*, 697 F.3d at 118.

In the context of motions to compel arbitration, allegations related to the question of whether the parties formed a valid arbitration agreement are evaluated to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial, which is a similar standard to that applicable for a motion for summary judgment.  *See id.* at 113; *see also Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (internal citations omitted).

If the Court determines that a valid agreement to arbitrate exists, the Court must then determine whether the particular dispute falls within the scope of arbitration clause.  *Specht v. Netscape Commc'ns Corp.*, 206 F.3d 17, 26 (2d Cir. 2002) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)).  If the dispute falls within the scope of the arbitration clause, the "role of the court ends and the matter is one for arbitration."  *Unique Woodworking, Inc. v. N.Y. City Dist. Council of Carpenters' Pension Fund*, No. 07 Civ. 1951 (WCC), 2007 WL 4267632, at *10 (S.D.N.Y. Nov. 30, 2007).

Moreover, "[f]ederal policy requires [courts] to construe arbitration clauses as broadly as possible" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal citations and quotations omitted).  "[U]nless it may be said with positive assurance" that the arbitration clause does not cover the disputed issue, the court must compel arbitration.  *Id.* at 19 (internal citation omitted).

### III.  DISCUSSION

Here, there is no dispute that the arbitration clause in the MDA that Goldman Sachs seeks to invoke was legally binding when Rollins executed the MDA in 2011.  The question is whether the clause was properly incorporated into Rollins' employment agreement with GSI, and, even if it was, whether it is governed by U.K. law.  To determine whether Rollins is bound by the

9

arbitration clause in the MDA, the court examines whether: (1) the arbitration clause in the MDA applies; and (2) the scope of the arbitration clause encompasses Rollins' claims. For the following reasons, the Court concludes the arbitration clause applies and that his claims—federal claims under the SEC and CFTC, and state law claims for fraudulent inducement and defamation—are arbitrable.

### A. There is a valid arbitration agreement under both U.K. and New York law.

#### 1. The MDA and the arbitration clause are incorporated into the employment contract.

##### i. The arbitration clause is incorporated under U.K. law.

Neither party disputes that the U.K. employment contract Rollins signed on September 22, 2016 includes the arbitration clause. Am. Compl. ¶ 57, Doc. 17; Defs.' Memo. at 1–2, Doc. 21. The MDA includes a choice of law provision in Clause 9.4 that states that MDA is to be governed by laws of the State of New York. Rogers Decl., Ex. B at 6 ¶¶ 8.1, 9.4, Doc. 22. Rollins, however, points to Clause 13 of the Annex, which provides for "the terms and conditions of [Rollins'] U.K.-specific employment, as set forth in this statement" to be governed by English law.

Rollins contends that English law governs the determination of whether there is an agreement to arbitrate because the U.K. employment contract with GSI is governed by English law. Pls.' Memo. at 9, Doc. 23. Rollins asserts three theories on why he believes the arbitration clause is not effectively incorporated into the employment contract under U.K. law: (1) under English law, the original MDA was superseded and made void by the Localization Memo and the Annex. Algazy Decl. ¶¶ 2, 34, Doc. 25; (2) there was no express attempt to incorporate the MDA into the remainder of the contract; and (3) incorporation would require "undue manipulation." Pls.' Memo. at 11, Doc. 23; *id.* ¶¶ 37, 54.

All three arguments fail.  First, there is no indication that the parties intended for the Localization Memo to "supersede" the MDA.  The cover letter states "I attach a copy of your GSI annex, which *together with* your previously signed Managing Director Agreement, the Addendum thereto, this letter and the localization memo dates 6 September 2016, represent the entire understanding of the parties with respect to the matters set forth therein and will supersede any other agreement, written or oral, pertaining to such matters."  (emphasis added).  As the cover letter indicates, each document included in the employment contract served different roles.  The Annex makes clear that it is a supplement to, not an override of, the MDA.  Indeed, the cover letter, which Rollins countersigned, expressly referred to and attached both the MDA and the Annex.  The letter confirmed that the MDA remained in force, supplemented by the Annex.  Moreover, the Annex's invocation of English law is, on its face, limited to the "terms and conditions of [Rollins'] U.K.-specific employment."  Rogers Decl., Ex. B at 13 ¶¶ 13.1, Doc. 22.  Thus, contrary to Rollins' assertion, the Annex does not supersede the MDA.

Next, Rollins argues that in the contract, "no specific mention is made to the incorporation of the arbitration clause in § 8 [of] the MDA," and the MDA is thus not validly incorporated.  Pl.'s Memo. at 11, Doc. 23.  However, this argument is unavailing because as described above, the cover letter expressly and explicitly indicates its intention for the MDA to be *part* of the contract, not overridden by the remainder of the contract.

Finally, Rollins asserts that subjecting an employee under a U.K.-governed contract to both U.S. rules of FINRA (¶8.1 of the MDA) and English law (¶¶13–14 of the Annex) creates a conflict.  Algazy Decl. ¶ 55, Doc. 25.  In response, Goldman Sachs claims that the appropriate arbitral tribunal would be able to resolve such conflicts, if there were any, by applying its choice of law rules.  Howard Decl. ¶¶ 53(1), Doc. 27.  The Court agrees that the tribunal would apply its

choice of law accordingly, and expects that the arbitration tribunal will respect the parties' choice of laws expressly set forth in the employment contract.

### ii. The arbitration clause is incorporated under New York law.

Under New York law, the issue of "whether or not the parties have agreed to arbitrate is a question of state contract law." *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 344 (S.D.N.Y. 2014) (internal citation omitted); *see also Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 522 (E.D.N.Y. 2017) (applying New York law in determining whether a valid agreement to arbitrate exists between a New York Uber driver and Uber). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *See Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 722 (E.D.N.Y. 2017) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)) (internal quotation marks omitted). Courts can infer acceptance when the party demonstrated at least constructive knowledge of the terms through his actions. *Id.* (citing *Hines v. Overstock.com, Inc.*, 380 Fed. Appx. 22, 25 (2d Cir. 2010).

The cover letter of the U.K. employment contract states unambiguously that the attachment includes the MDA, which is a photocopy of the very MDA that Rollins signed in 2011. Rogers Decl., Ex. B, Doc. 22; Am. Compl. at 8, n.3, Doc. 17. In signing the cover letter, Rollins affirmed that he understood and acknowledged the terms of the employment contract, including the arbitration clause in the MDA. There is no ambiguity as to the parties' intent to form a valid contract and accept the arbitration terms. Thus, the Court concludes that under New York law, the arbitration clause included in the MDA was validly incorporated into the U.K. contract.

### 2. The arbitration clause is valid.

Rollins acknowledges that the MDA is governed by New York law, and that it provides for a FINRA arbitration in New York, under FINRA rules. *See* Pl.'s Memo. at 11, Doc. 23. Thus, Rollins appears to concede that if the Court determines that the arbitration is validly incorporated as part of the U.K. employment contract, the Court may use New York law to enforce the arbitration clause. Because this Court has determined that the arbitration clause and the MDA are valid components of the U.K. employment contract, the Court finds that the arbitration clause must be enforced.

### B. Rollins' claims are within the scope of the arbitration clause.

### 1. Federal law SEC and CFTC claims are arbitrable.

Once the court has determined that the arbitration clause may be enforced, the scope of the clause will be determined by New York law, as stated in the MDA. By signing the MDA, Rollins agreed that "any dispute, controversy or claim arising out of or based upon or relating to Employment Related Matters will be finally settled by arbitration" and that he "underst[ood] and acknowledge[d] that [he] [was] agreeing to arbitrate all claims described above, in accordance with the arbitration procedure set forth" in the MDA. Rogers Decl., Ex. B at 6–7 ¶¶ 8.1, 8.2, Doc. 22. The MDA defines "Employment Related Matters" as matters "arising out of or relating to or concerning the Employment Documentation, [Rollins'] hire by or employment with the Firm or the termination thereof, or otherwise concerning any rights, obligations or other aspects of [Rollins'] employment relationship in respect of the Firm." *Id.* at 8 ¶10.

The basis of Rollins' claims for his SEC and CFTC claims is that Goldman Sachs retaliated against him for his "series of disclosures, including,… those made in his interviews [with the Firm]," internal reports, and Form TCRs. Am. Compl. ¶ 104, Doc. 17. Rollins alleges

that through these disclosures, he reported his reasonable belief that Goldman Sachs was violating CFCT and SEC regulations in engaging with the Financier, failing to comply with AML-related obligations, and failing to detect and report evidence of potential financial crimes. *Id.* ¶¶ 104–105, 120.

These alleged grievances fall squarely within the scope of "Employment Related Matters" as defined in MDA Clause 10. Thus, his federal law claims are subject to arbitration.

### 2. State law claims—fraudulent inducement and defamation—are also arbitrable.

Rollins' fraudulent inducement claim is based on his allegation that the U.K. Employment Contract "was intended to lead Rollins to believe that it was his permanent U.K. employment contract," and that it was a "self-serving document" primarily intended to make Rollins a U.K. employee for purposes of retroactive application of U.K. policy and rules. *Id.* ¶¶ 133–34. He claims that Goldman Sachs ultimately "used the U.K. contract to allow GSI to terminate Rollins." *Id.* ¶ 135. With respect to the defamation claim, Rollins claims that Goldman Sachs sent a false and defamatory response on May 15, 2018 to a U.K.-based potential employer's request for a reference. *Id.* ¶ 99.

Both state law claims are clearly "Employment Related Matters" as defined by Clause 10.1 of the MDA. Therefore, state law claims of fraudulent inducement and defamation are subject to arbitration.

## III. Conclusion[3]

For the reasons set forth above, Goldman Sachs' motion to compel arbitration is GRANTED, and this action is STAYED pending arbitration. The parties are instructed to advise the Court within 48 hours of the outcome of the arbitration. The Clerk of the Court is respectfully directed to stay this action pending arbitration and terminate the motion, Doc. 20.

It is SO ORDERED.

Dated: July 2, 2019
       New York, New York

                                                          Edgardo Ramos, U.S.D.J.

---

[3] Even if Rollins' claims were not arbitrable, his retaliation claims pursuant to the Dodd-Frank Act would have to be dismissed because Rollins does not qualify as a whistleblower as defined by the relevant statutes. The Supreme Court held that the Dodd-Frank Act's SEC anti-retaliation provision applies only to acts after an individual provides information to the SEC. *See Digital Realty Trust, Inc. v. Somers*, 138 S.Ct. 767, 778 (2018) (explaining that an individual is not protected by the anti-retaliation provisions until the individual has reported misconduct to the SEC). There is no evidence that Congress intended to treat the CFCT provision any differently. Rollins is thus not entitled to protection by the anti-retaliation provisions because he was terminated *before* he reported to the SEC and CFTC. Defs.' Memo. at 9, Doc. 21. Similarly, his state law claims would be dismissed upon dismissal of Plaintiff's federal law claims. A district court may decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998). This Court would have declined to exercise its supplemental jurisdiction over Rollins' state claims.